Nichols Loan Corporation of Terre Haute, et al. [1] v. Commissioner. Nichols Loan Corp. v. Commissioner
Docket Nos. 86794-86800.
United States Tax Court
T.C. Memo 1962-149; 1962 Tax Ct. Memo LEXIS 160; 21 T.C.M. (CCH) 805; T.C.M. (RIA) 62149; June 22, 1962
*160 1. Held, that insurance agency commissions paid by a life insurance company to a stockholder-officer of each of the petitioner corporations (which were engaged in the business of making small loans), in respect of sales of life and accident and health insurance to certain borrowers from the petitioners, are not includible in the gross incomes of said petitioners. Held, further, however, that a portion of the general overhead expense of each petitioner corporation, which is attributable to the handling of such insurance on behalf of its stockholder-officer, should be disallowed. 2. Held, that petitioners have failed to establish that respondent abused the discretion vested in him by section 166(c) of the 1954 Code, when he determined as to four of the petitioners, that "a reasonable addition" to their bad debt reserves was an amount sufficient to bring said reserves up to 4 percent of their outstanding loans receivable. Benjamin G. Cox, Esq., 613 Merchants National Bank Bldg., Terre Haute, Inc., for the petitioners. James D. Biltz, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of *161 the petitioner corporations, for calendar years and in amounts as follows: Docket
Taxable
No.
Petitioner
Year
Deficiency
86794
Nichols Loan Corporation of Terre Haute
1955
$3,050.32
1956
3,702.89
1957
4,016.61
86795
Nichols Loan Corporation of Brazil
1955
617.63
1956
927.20
1957
1,308.38
86796
Nichols Loan Corporation of Clinton
1955
2,221.88
1956
162.18
1957
1,934.92
86797
Nichols Loan Corporation of Indianapolis
1956 **
* *162 1957
4,706.08
86798
Nichols Loan Corporation of Crawfordsville
1955
*
1956
620.09
1957
2,121.28
86799
Nichols Loan Corporation of East Chicago
1955
*
1956
2,991.55
1957
1,772.22
86800
Nichols Loan Corporation of Michigan City
1955
2,137.31
1956
1,039.61
1957
765.61
The cases were consolidated for trial. The issues presented for decision are: (1) Whether insurance agency commissions paid by an independent insurance company to a stockholder-officer of each of the petitioner corporations (which were engaged in the small loan business), in respect of sales of policies for life and accident and health insurance to individuals who borrowed money from the petitioners, are taxable to the petitioner corporations. (2) Alternatively, if such insurance agency commissions are not taxable to the petitioner corporations, whether a portion of the operating expense deductions of each of said corporations should be disallowed, as representing expenses attributable to handling the insurance business of said stockholder-officer. The foregoing issues are present in the case of each of the petitioner corporations. (3) What amount should be allowed, for each of the taxable years involved, as a "reasonable addition" to the reserve for bad debts, within *163 the meaning of section 166(c) of the Internal Revenue Code of 1954, [2] of each of the four petitioner corporations which are located in the cities of Clinton, Crawfordsville, East Chicago, and Michigan City? Disposition of another issue, relating to respondent's partial disallowance of net operating loss carryover deductions claimed by the Crawfordsville, East Chicago and Indianapolis corporations, will, insofar as said disallowance was caused by the adjustments involved in issues (1), (2) and (3) above, depend upon the decision of the said last-mentioned issues. All other issues raised by the pleadings have been conceded by the petitioners in the stipulation of facts. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. Each of the petitioners is an Indiana corporation organized and existing under the Indiana General Corporation Act. All the petitioners filed their returns for the taxable years here involved, with the district director of internal revenue at Indianapolis, Indiana. *164 Each of the petitioner corporations carried on a small loan business in the Indiana city which appears in its corporate name; [3] *166 and each operated under a license issued by the appropriate authorities of the State of Indiana, pursuant to the Small Loan Act of that state. Such act authorizes corporations qualifying thereunder to make loans of $500 or less to each borrower, at regulated rates of interest which are higher than those permitted to banks and other lending institutions. The Terre Haute, East Chicago, and Michigan City corporations, each of which was organized in April 1951, are successors to partnerships which likewise had operated small loan businesses. The members of these predecessor partnerships were two brothers, George O. Nichols and John G. Nichols; and these individuals have owned, in equal portions, all of the stock of these corporations since the times of organization. The Clinton corporation likewise was organized in April 1951 as successor to a partnership which had engaged in the small loan business. The members of this predecessor partnership were William B. Nichols and Carrie T. Nichols, the parents of the above-mentioned George and John Nichols. At the time *165 of the organization of the Clinton corporation, all of its stock was owned, in equal portions, by William and Carrie Nichols; but Carrie died in September 1951, and since that time the shares have been owned 50 percent by William, and 25 percent by George and John, respectively. As regards the Brazil, Crawfordsville, and Indianapolis corporations, these were organized by George and John Nichols in August 1952, April 1954, and March 1956, respectively; and these individuals have at all times owned all the issued and outstanding shares of these corporations, in equal portions. During the taxable years involved, George Nichols was president of each of the petitioner corporations, except the Clinton corporation of which he was vice president; William Nichols was president of the Clinton corporation; and John Nichols held the office of either vice president or secretary-treasurer, of each of the corporations. An individual named William F. George held the office of assistant secretary-treasurer of each corporation, during the year 1957. Prior to the organization of the Terre Haute, Michigan City, and East Chicago corporations in April 1951, and while George and John Nichols were operating partnerships engaged in the small loan business in these localities, these partners had sold life insurance to persons who borrowed money from the partnerships. [4] Such policies of insurance were in the same amounts as the loans; and the policies provided that, in the event of the death of the customer while he had a loan outstanding, the insurance company would pay the lenderpartnership the balance due on the loan, and pay the remainder of the proceeds of the policy to the estate of the customer. Insurance of this type is commonly called, and it is hereinafter referred to as, "credit insurance." As regards the partnership which was the predecessor of the Clinton corporation, William Nichols likewise had sold credit insurance to customers of that partnership. When the Terre Haute, Clinton, *167 Michigan City and East Chicago corporations were formed in 1951, the assets listed on schedules attached to the bills of sale received by said petitioner corporations, were: Cash; loans receivable; fixed assets; and prepaid expenses - all pertaining to the small loan business. No mention of any credit insurance business was made in any of these bills of sale. Also, the only asset acquired by each of the other three petitioner corporations at the time of their organization was cash paid in by their incorporators. Any corporation organized under the Indiana General Corporation Act is forbidden to engage in the insurance business. [5] Also under Indiana statutory law, life insurance agents are required to be "natural persons"; [6] and corporations are specifically forbidden to act as agents for life insurance companies. [7] "Life insurance" is defined under such law to include not only insurance against death but also against physical disability resulting from accident or disease. [8] *168 The corporate purposes of the petitioner corporations, as set forth in their articles of incorporation, do not include that of acting as an insurance agent. The following statement is included in the articles of incorporation of each of the petitioners: "[The] corporation shall not engage in * * * any business excluded from The Indiana General Corporation Act." Most of the customers of each of the petitioner corporations bought credit insurance at the time of procuring their loans. The insurance company which issued the policies of credit insurance to the customers of the petitioner corporations, at all times here material, was the Old Republic Life Insurance Company of Chicago, Illinois (hereinafter called "Old Republic"). Prior to December 1, 1956, the types of insurance issued to the respective customers were single premium term life insurance policies, and individual health and accident indemnity insurance policies. But beginning on December 1, 1956, and at all times thereafter, the coverage was evidenced by certificates of participation in group policies issued to "Nichols Loan Corporation of Terra Haute, Terre Haute, Indiana, and any or all associated, *169 affiliated, or subsidiary companies or corporations." George Nichols individually had prior to 1952 been an insurance agent for the Lincoln National Life Insurance Company; but in the latter year, he made the arrangements with Old Republic Company under which he was appointed as the representative of said insurance company to solicit both life insurance and health and accident insurance with respect to customers of the petitioner corporations. Later, in December 1956, the foregoing arrangement with Old Republic was modified, so that thereafter George Nichols was designated in one agreement to be the agent of said company to sell policies of life insurance to the petitioner corporations' customers; and William F. George, as distinguished from George Nichols, was designated in another agreement to be the representative of that company to sell policies of accident and health insurance to such customers. Also throughout the taxable years involved, Old Republic designated ten additional persons as being authorized to sell both life insurance policies and accident and health policies to customers of the several petitioner corporations; which persons were: William Nichols, the president of *170 the Clinton corporation; and nine individuals who were at various times the office managers of the several petitioner corporations. Notwithstanding such set-up, the only written "agency agreements" with Old Republic which are of record, are those above mentioned which gave agency status to George Nichols and to William George. George Nichols, William George, William Nichols, and the nine office managers all were duly licensed by the State of Indiana to sell life insurance and accident and health insurance, throughout the taxable years involved. The parties have stipulated that the procedures through which the petitioner corporations made loans to customers, and through which credit insurance was sold to such customers, were similar for all seven of the petitioner corporations. Such procedures were as follows. When an applicant for a loan came into the office of one of the petitioner corporations, he was taken to a private booth where he was interviewed by the office manager. This office manager procured various information from the applicant, in order to determine whether he was a good credit risk - such as: Where the applicant worked; how long he had been employed in such work; and *171 the names of any stores where he had credit. After the foregoing information was obtained, the applicant was told that he would be notified if and when his loan application was approved; and thereupon, the office manager proceeded to seek verification of the information furnished. Following such verification, if the manager was satisfied that the applicant was a good credit risk, he would notify the applicant and instruct him to return to the corporation's office to sign a promissory note and receive the proceeds of his loan. Upon the applicant's return to the office, he again was taken to a private booth where the office manager explained the terms of the loan; and if the customer agreed to the same, the office manager would then instruct one of the office employees to type up a promissory note for the borrower's signature, and to prepare certain office records pertaining to the loan. While the above-mentioned promissory note and office records were thus being prepared, the office manager would inform the customer of the availability of credit life and accident and health insurance, and of the cost thereof; and he also would explain the benefits and advantages of such type of insurance. *172 In some instances, the customer already was familiar with credit insurance; and in such circumstance, he would himself inquire about its availability, even before the office manager mentioned it. None of the petitioner corporations required its customers to purchase credit insurance; but about 90 percent of the customers of each petitioner did purchase such insurance. In cases where the customer decided to buy such insurance, the office manager would so inform the office employee who was typing the promissory note and office records; and thereupon such employee would fill out a certificate form which showed the insurance coverage to be provided. The customer then signed the promissory note for his loan; whereupon he was given the net proceeds of the loan in cash, after a sufficient amount had been withheld therefrom to cover the premium for the credit insurance. The customer was at the same time given the above-mentioned certificate for his insurance. The practice of each of the petitioner corporations was to keep the amounts received for insurance premiums separate from its other funds such as loan repayments. However, the office manager would periodically take the cash premiums so *173 collected, deposit the same in the particular corporation's bank account, and then simultaneously draw a check equal to the amount of such premiums to the order of George Nichols, and send it to the latter. George Nichols, in turn, would deposit the checks so received in his personal bank account; and then once each month, he would transmit his own check to Old Republic for the aggregate amount of the net premiums (i.e., the total premiums received during such month, less the commissions due him thereon). The rate of such commissions to George was, as specified in his agency agreement, 50 percent of each insurance premium collected. None of the insurance premiums, gross or net, were ever entered on the books of account of any petitioner corporation; nor were any of the insurance commissions reported on the Federal income tax returns of any of the petitioners. All the insurance commissions were received by George Nichols; but he did not however report all of the same on his Federal income tax returns. Rather, these commissions were reported for tax purposes as follows: George Nichols and John Nichols each reported half of the commissions on credit insurance written for customers of *174 all petitioner corporations other than the Clinton corporation; and their father, William Nichols who was president of the Clinton corporation, reported all the commissions from insurance written for customers of that corporation. Neither William George, nor any of the above-mentioned nine office managers, either received or reported for taxation, any insurance commissions during any of the taxable years here involved. The following table shows the amounts of the insurance premiums on credit insurance written for customers of all petitioner corporations, and the amounts of the agent's commissions thereon which were received by George Nichols in each of the taxable years: 1955
1956
1957
Premiums: Life
$32,661.69
$43,427.89
$37,029.62
Accident and health
8,347.40
11,217.84
54,645.53
Agency Commissions: Life
16,331.09
21,726.31
18,505.40
Accident and health
3,338.94
4,645.54
27,315.74
In the office of each petitioner corporation there were placed on the counters and desks therein, certain display cards and brochures which advertised the Old Republic credit insurance. None of these made any reference to any authorized agent of the company. All this advertising material, as well as the necessary insurance *175 forms and certificates, were furnished by Old Republic at the request of George Nichols. The office records of each petitioner corporation included a 3inch X 5inch ledger card for each customer; and on these ledger cards there was noted, among other things, whether or not the customer had credit insurance. Also, on the daily report sheet which the office manager of each of the petitioner corporations prepared, there was shown the amount of insurance premiums, if any, collected from each customer. George Nichols did not pay any amount to any of the petitioner corporations during the taxable years, either as rent or as reimbursement for office expenses and services, with respect to the writing of insurance in their offices. The availability of credit insurance for customers was advantageous to the petitioner corporation, for it not only was convenient for their customers to have "one-stop" service for both financing and insurance, which many of these customers expected to find available; but also, in cases where such credit insurance was purchased, the effect was that the petitioner corporation's risk of bad debt losses was reduced. As regards the third issue, pertaining to the reserves *176 for bad debts of the Clinton, Crawfordsville, East Chicago and Michigan City corporations, each of these corporations utilized the reserve method of accounting for bad debts, not only during all the taxable years but also during all preceding years. The following table shows, as to each of the above-mentioned corporations for its taxable years as well as for all prior years: (1) The year-end balance of its outstanding loans receivable; (2) the loans charged off as worthless during each year; (3) the recoveries of loans charged off in previous years; (4) the net loans charged off (i.e., the loans charged off, less the recoveries); (5) the percentage which the net loans charged off bears to the balance of the loans receivable; and (6) the reserve for bad debts remaining at the end of each year: Percentage
Reserve for
Recoveries
of net
bad debts
Year
Loans
Loans
of loans
Net loans
charge-off
after peti-
ended
receivable
charged
charged off
charged
to loans
tioner's
off
off
addi-
Dec. 31
outstanding
during
previously
during
outstanding
tions there
year
year
to
Clinton Corporation
1952
$305,142.43
$12,243.75
$2,040.29
$10,203.46
3.34
$15,257.27
1953
339,279.24
13,592.96
1,773.42
11,819.54
3.48
16,963.96
1954
361,392.92
19,870.28
1,622.12
18,248.16
5.04
18,069.65
1955
335,940.10
14,300.40
2,828.94
11,471.46
3.41
16,797.00
1956
306,665.52
14,701.75
5,983.87
8,717.88
2.84
15,332.78
1957
279,001.67
12,017.74
1,876.97
10,140.27
3.63
13,950.08
Crawfordsville Corporation
1954
34,908.59
1,745.42
1955
80,827.19
Not shown
1956
124,719.81
932.48
932.48
0.74
6,235.99
1957
170,351.53
4,132.82
257.71
3,875.11
2.26
8,517.58
East Chicago Corporation
1952
171,293.85
9,442.51
1,022.45
8,420.06
4.91
8,564.69
1953
207,761.16
11,812.20
1,495.02
10,317.18
4.96
10,388.08
1954
229,416.98
11,151.67
2,288.74
8,862.93
3.86
11,470.85
1955
258,914.49
11,066.90
2,639.15
8,427.75
3.25
12,945.72
1956
284,833.78
7,901.51
2,237.69
5,663.82
1.98
14,241.69
1957
289,275.74
9,941.92
2,209.16
7,732.76
2.67
14,463.79
Michigan City Corporation
1952
310,216.60
5,033.64
2,675.78
2,357.86
0.76
15,510.83
1953
350,926.65
10,030.05
2,643.50
7,386.55
2.10
17,546.34
1954
324,380.05
11,188.43
3,490.33
7,698.10
2.37
16,219.00
1955
311,444.53
11,460.76
5,091.78
6,368.98
2.04
15,572.22
1956
265,774.27
9,447.58
5,090.44
4,377.14
1.19
18,288.71
1957
452,689.47
15,734.86
3,833.27
11,901.59
2.62
18,554.34
*177 Each of said petitioner corporations added to its reserve for bad debts in each of the taxable years, an amount sufficient to bring such reserve up to 5 percent of its outstanding loans receivable. These amounts were determined in conferences between George Nichols, John Nichols and William Nichols; and these officers in fixing such amounts, took into consideration such factors as: The prior experience of the petitioners with loans becoming worthless; the economic conditions prevailing in the locality where each of said petitioners conducted its operations; the general business prospects for the succeeding 2-year period; the extent of customers' delinquencies in repaying loans; and the extent to which customers were renewing their loans. The respondent, in his notices of deficiency, determined that as to each of said petitioners, a "reasonable allowance" to its reserve for bad debts, within the meaning of section 166(c) of the 1954 Code, was such amount as would bring each corporation's year-end bad debt reserve up to 4 percent of its then outstanding loans receivable. Opinion Re: Issues 1 and 2, Relating to Credit Insurance The first and second issues presented for decision pertain *178 to how the agency commissions paid by Old Republic Insurance Company in respect to policies issued to customers of the petitioner corporations, and the overhead agency expenses of selling and handling such insurance, should be handled for Federal income tax purposes. The respondent contends, in substance: (1) That said agency commissions should be included in the gross incomes of the petitioner corporations; or (2) that, in the alternative, if such commissions are not chargeable to the petitioner corporations, then a portion of the office overhead expenses of the corporations which is attributable to handling such insurance on behalf of their stockholder-officer George Nichols, should be disallowed. We believe that the second of these alternatives is the proper one. As we have heretofore shown in our Findings of Fact, George and John Nichols and their father, William Nichols, had for many years prior to the organization of the petitioner corporations engaged as partners, both in the business of making small loans and also in the business of selling life insurance to their borrowers. Thereafter during the years 1951 through 1956, the petitioner corporations were formed by these same *179 individuals for the purpose either of taking over the small loan businesses of the prior partnerships, or of establishing new small loan businesses. But in so organizing these corporations, said individuals did not transfer to any of the corporations any portions of their insurance agency businesses. In 1952, George Nichols individually had made the original arrangements with Old Republic Insurance Company, under which he individually became the authorized agent to sell insurance for that company; under which he was to receive a 50 percent commission on any insurance sold; and under which he was permitted to transmit the net premiums to the insurer only at the end of each month. Following the organization of the petitioner corporations, he did not maintain any separate insurance office; but rather, he made arrangements whereby, with no cost to him, the office manager of each petitioner corporation would bring the insurance to the attention of the corporation's customers; whereby other employees of the corporations would fill out the necessary papers for obtaining the insurance; and whereby the amounts of the insurance premiums would be withheld from the proceeds of the borrowers' *180 loans, and then be transmitted to him for his accounting with Old Republic. The statutes of Indiana not only specifically forbade any corporation to act as an insurance agent, but they also required all life insurance agents to be "natural persons." None of the petitioner corporations had any authority or power under its charter to act as an insurance agent. We have concluded from our consideration of all the evidence, that none of the several corporations intended to, or did in fact, act as an insurance agent in violation of the Indiana law. Rather, what actually happened was that each of the petitioner corporations furnished George Nichols, without any cost to him, with the equivalent of the accommodations and services which he otherwise would individually have had to provide if he had maintained his own insurance office in each city where the policies were written. And the result was that George Nichols received the entire amount of the substantial agency commissions, without any overhead cost to him whatever. We believe, therefore, that the agency commissions did not constitute income to the several petitioner corporations; but that, nevertheless, a portion of the general overhead *181 expenses of each petitioner corporation, which was attributable to the handling of George's insurance business, should be disallowed as not being attributable to the carrying on of the corporation's own small loan business. See Campbell County State Bank, 37 T.C.. The problem remains as to how those portions of the several petitioners' overhead expenses which are to be disallowed, should be determined. Since none of the corporations maintained any accounting cost records which would provide a basis for the breakdown, we have concluded that an approximation should be made in accordance with the principle set forth in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2), to the effect that we should make as close an approximation as we can, even though we bear heavily upon the taxpayer whose inexactitude is of its own making. Applying such principle, we here find and hold that the portion of each corporation's total overhead expenses which was attributable to the handling of George Nichols' insurance, as distinguished from the handling of its own small loan operations, is an amount equal to 50 percent of the gross commissions which Old Republic allowed to George Nichols as agency commissions *182 on insurance written in the office of such corporation. On the basis of the foregoing, we decide Issue 1 in favor of the petitioners; and, as to Issue 2, we decide that a portion of the total overhead expenses of each petitioner corporation for each taxable year as claimed on its return, should be disallowed in accordance with the formula which we have above set forth. Re: Issue 3, Relating to Additions to Reserves for Bad Debts The third issue for decision is, what is "a reasonable addition" for each taxable year to the reserve for bad debts of the Clinton, Crawfordsville, East Chicago, and Michigan City corporations, within the meaning of section 166(c) of the 1954 Code. These petitioners assert that such "reasonable addition" is an amount that would bring their respective reserves up to 5 percent of the amount of their outstanding loans receivable at the end of each year. The respondent determined, on the other hand, that such reasonable addition is the amount which would bring their reserves up to 4 percent of their outstanding receivables. Section 166(c) of the 1954 Code provides as follows: (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a) [relating *183 to specific charge-offs of bad debts], there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. These petitioners bear the "heavy burden" of establishing that the respondent, in determining the 4 percent rate, abused the discretion vested in him by the statute. See Maverick-Clarke Litho Co. v. Commissioner, (C.A. 5) 180 F. 2d 587, 594, affirming 11 T.C. 1087, cited with approval by the Court of Appeals for the Seventh Circuit in S. W. Coe & Co. v. Dallman, 216 F. 2d 566, 570. It is our opinion that these petitioners have not borne that heavy burden. The evidence establishes that during all taxable years involved, there were only three instances in which the bad debt losses of any of the corporations exceeded 4 percent of the outstanding loans receivable. We have, on the other hand, the conclusory testimony of George Nichols to the effect that he, his brother, and his father had conferred on the amount of the annual additions to the bad debt reserves; and that they had taken into account not only the loss experience of prior years, but also certain other factors, such as business conditions in the *184 localities of these petitioners' business operations, and the outlook for business generally in those localities. This testimony is, however, notably lacking in specific facts as to what actually motivated the decision of said officials to peg the reserves at 5 percent of loans outstanding. From our appraisal of the evidence, we are impelled to conclude that these petitioners have failed to establish any abuse of discretion on the part of the respondent. Also, we are satisfied that bad debt reserves equal to 4 percent of the loans receivable outstanding were ample to cover whatever bad debt losses the petitioner corporation could reasonably have expected. We decide this issue for the respondent. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Nichols Loan Corporation of Brazil, Docket No. 86795; Nichols Loan Corporation of Clinton, Docket No. 86796; Nichols Loan Corporation of Indianapolis, Docket No. 86797; Nichols Loan Corporation of Crawfordsville, Docket No. 86798; Nichols Loan Corporation of East Chicago, Docket No. 86799; and Nichols Loan Corporation of Michigan City, Docket No. 86800.↩
**. Taxable period of March 21 through December 31, 1956.↩
*. For those years and those petitioners where no deficiency has been determined, the respondent's adjustments have reduced, but not eliminated, the net operating losses shown on petitioners' returns for such years. Consequently, the net operating loss carryover deductions claimed by said petitioners on their returns for subsequent years, have been correspondingly reduced by the respondent. This Court has no jurisdiction as to the years where no deficiency has been determined; but we may take into account the adjustments made in said years, insofar as said adjustments affect the amount of net operating loss carryover deductions in taxable years for which a deficiency has been determined. See Ernest J. Keefe, 15 T.C. 947, 954↩. 2. All section references herein are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. For convenience, each of the petitioner corporations will be hereinafter referred to by the name of the city that appears in its name. For example, the Nichols Loan Corporation of Terre Haute will be referred to herein as the "Terre Haute Corporation."
4. For simplicity, persons who borrowed money from the petitioner corporations, or from the predecessor partnerships, will be referred to as "customers."↩
5. Title 25, section 201, Burns Indiana Statutes Annotated. ↩
6. Title 39, section 4601, Burns Indiana Statutes Annotated. ↩
7. Title 39, section 4608, Burns Indiana Statutes Annotated. ↩
8. Title 39, sections 3203 and 3501, Burns Indiana Statutes Annotated.