**LOCAL FINANCE CORPORATION, Local Finance Corporation of South Marion, Local Finance Corporation of Elkhart, Local Finance Corporation of Gas City, Local Finance Corporation of Rushville, Local Finance Corporation of Danville, Local Finance, Inc., Local Finance Co., Inc. of Gary, Local Finance Company, Inc., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant,**

v.

**GUARDIAN AGENCY, INC., Beneficial Insurance Agency, Inc., Petitioners-Appellees.**

**Nos. 16840–16850.**

United States Court of Appeals
Seventh Circuit.

Feb. 28, 1969.

Rehearing Denied April 9, 1969.

Stephen A. Milwid, John K. O'Connor, Max E. Meyer, Wilbur S. Legg, Chicago, Ill., Lord, Bissell & Brook, Chicago, Ill., of counsel, for Local Finance Corp.

Mitchell Rogovin, Asst. Atty. Gen., Stuart A. Smith, Attorney, Department of Justice, Tax Division, Washington, D. C., Lee A. Jackson, J. Edward Shillingburg, Attorneys, Department of Justice, Washington, D. C., for C.I.R.

Before SWYGERT, FAIRCHILD and KERNER, Circuit Judges.

SWYGERT, Circuit Judge.

We are asked to review a decision of the Tax Court upholding the assessment of income tax deficiencies by the Commissioner of Internal Revenue.[1] This case presents the question whether the Tax Court was correct in holding that the Commissioner's allocation to the petitioners, Local Finance Corporation and its subsidiaries pursuant to his authority under Int.Rev.Code of 1954, § 482,[2] of one-half of the credit life insurance net premiums paid by borrowers from these corporations was not arbitrary or unreasonable. Federal income taxes for the years 1958 through 1962 in the amount of $418,977.31 are in question.

The facts are largely undisputed and have been set forth in the Tax Court's opinion reported at 48 T.C. No. 76 (Aug. 31, 1967). We will only recite the facts which are necessary for a basic understanding of the financial interrelationships which existed between the various corporate taxpayers involved in this appeal. Taxpayers are Indiana corporations which, during the years in question, engaged in the business of making small and industrial loans. Local Finance Corporation is the parent corporation and all the other named finance company taxpayers are wholly owned subsidiaries of Local Finance.

Taxpayers, Guardian Agency, Inc. and Beneficial Insurance Agency, Inc., are respectively parent and wholly owned subsidiary. They were organized as general insurance brokers to provide fire and casualty insurance coverage on property given as security to Local Finance by its borrowers. The finance companies were virtually the entire source of their fire and casualty business. During the years in question, stockholders who owned in excess of seventy per cent of Local Finance's stock also owned all the stock of Guardian and its subsidiary beneficial.

---

[1] In addition, the Commissioner also petitions for review on the basis that if this court reverses the decisions of the Tax Court with respect to the income allocation to Local Finance and its subsidiaries, the cause should be remanded for consideration of the Commissioner's alternative allocation to Guardian Agency, Inc. and Beneficial Insurance Agency, Inc.

[2] Section 482 provides:
In any case of two or more organizations, trades or businesses * * * owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

In connection with the loans made by the finance companies, credit life insurance was offered to their borrowers for a term which was coextensive with the contractual term of the related indebtedness. Although not required to do so, about ninety per cent of the borrowers took out credit life insurance. This insurance was written by Old Republic Life Insurance Company, an unrelated concern, at a rate of one dollar per year per $100 of coverage. Such rate was commonly charged in the credit life insurance industry in Indiana and its reasonableness is not at issue. Since it was customary for insurance companies to pay a commission for the sales of such insurance, the rate of premium charged by Republic was fixed in an amount sufficient to provide for such commission.

During the period January 1 through June 30, 1958, the commissions on the credit life insurance sold to borrowers from the finance companies were not paid directly to the finance companies. Rather, such commissions were paid pursuant to an agreement entered into between Republic and Don H. Miller, who was an officer of each of the finance companies. The agreement provided that Miller should act as agent for Republic and receive a fixed commission of forty per cent of the net premiums paid by the borrowers from the finance companies, that Republic should retain nine and a half per cent of such net premiums to cover its overhead and profit, and that Miller should receive an additional contingent commission measured by the remainder of the net premiums after payment of all claims. Miller simultaneously executed an assignment of such commissions to Guardian. The commissions so assigned to Guardian over the period ending June 30, 1958 amounted to about fifty-six per cent of total net premiums.

After June 30, 1958, Republic continued to write the insurance on the lives of the borrowers from the finance companies, but no commissions, as such, were paid to Miller. Instead, Republic entered into an agreement with Grand National Life Insurance Company, an Arizona corporation, which was controlled by the finance companies and Guardian, whereby Grand National agreed to reinsure the risks and receive ninety and a half per cent of the net premiums, Republic retaining nine and a half per cent of the net premiums. Over the period July 1, 1958 through December 31, 1962, the proceeds which Grand National received, after provision for payment of the claims, amounted to about fifty-eight per cent of the total net premiums. Grand National also had some operating expenses, but in relatively small amounts.

It was the contention of the Commissioner before the Tax Court that a portion of the commission income received by Guardian and Beneficial during the period January 1 to June 30, 1958 and a portion of the reinsurance premiums received by Grand National during the period July 1, 1958 to December 31, 1962 constituted compensation actually earned by the finance companies for selling and processing the credit life insurance, and therefore should be allocated to them in proportion to the amount of insurance which each finance company sold. The amounts allocated by the Commissioner equaled fifty per cent of the total net premiums received by the finance companies throughout the taxable years in question. The Tax Court upheld the Commissioner's allocation and deficiency assessment and found that fifty per cent of the net premiums were taxable to the finance companies under sections 61 and 482 of the Internal Revenue Code.

■■ The taxpayers make two principal contentions: that the finance companies did not earn or have sufficient control over the premium income from the insurance to be taxed thereon and that the Tax Court's decision conflicts with prior cases holding that a taxpayer is not taxable on income he does not receive and is prohibited by law from receiving. In reviewing the Commissioner's allocation and the Tax Court's determination, our inquiry is a limited

one. Ballentine Motor Co. v. Commissioner of Internal Revenue, 321 F.2d 796 (4th Cir. 1963). When evaluating section 482 situations, the Commissioner is empowered to examine closely the transactions between controlled taxable entities in order to determine whether they are such as would have been consummated in an arm's length negotiation between strangers and to make an allocation when they fail to meet that standard. Eli Lilly & Co. v. United States, 178 Ct.Cl. 666, 372 F.2d 990, 1000 (1967); Oil Base, Inc. v. Commissioner of Internal Revenue, 362 F.2d 212, 214 (9th Cir. 1966). Because of the Commissioner's broad discretion to appraise the factual situation, his determination under section 482 "is essentially one of fact and * * * must be affirmed if supported by substantial evidence." Advance Machinery Exchange v. Commissioner of Internal Revenue, 196 F.2d 1006, 1007–1008 (2d Cir. 1952).

■ The two primary elements which must exist to sustain a section 482 allocation are the existence of commonly controlled companies and the earning of income by certain of these companies which in the absence of the Commissioner's reallocation would not adequately be reflected in the income they would otherwise report for federal income tax purposes.

The goal of the statutory allocation procedure is to insure that controlled taxpayers are placed on a parity with uncontrolled taxpayers. Turning first to the question of common control, there is no doubt that during the years at issue Local Finance, Guardian, Beneficial, and Grand National were controlled by the same interests within the meaning of section 482. The common shareholder interests previously described make it

clear that the "control" requirements have been met.[3]

■ The more difficult inquiry is whether the finance companies and insurance companies would have entered into the same arrangements had they been uncontrolled corporations and bargained at arm's length. This question can be resolved only by determining who actually earned the commission premiums. The undisputed evidence in the record shows that during the entire period employees of the finance companies performed most of the services incident to the sale and servicing of the insurance. It is well known that insurers pay policy solicitors a portion of the premium as a commission for generating and processing the insurance. The touchstone of our analysis is who expended the effort which caused the policies to be issued. The record demonstrates that it was the finance companies who advised the borrowers of the opportunity to obtain life insurance and encouraged them to subscribe.[4] The finance companies wrote the policies, collected the premiums and deposited them in the bank accounts of Guardian and Beneficial, made refunds, prepared the necessary papers in the event of the death of an insured borrower, and made weekly reports to Guardian and Beneficial. The sole function of the latter companies was to collate and transmit information and premiums to Old Republic.[5] The Commissioner's allocation had the effect of compensating the finance companies for their efforts in generating and processing the life insurance. Despite the fact that the commissions were diverted to Guardian and Grand National during the period in question, it is clear that neither entity earned the commissions. Because the record indicated that Beneficial received commissions amounting to

---

3. *See* Treas.Reg. § 1.482–1(a) (3) (1967).

4. The record establishes the finance companies' expertise in this regard. Although the borrowers were not required to purchase credit life insurance, eighty-five to ninety-five per cent of them did so.

5. No contention is made that Grand National, the reinsurer, was not a valid business entity; our holding rests on an application of income-earning criteria to the taxpayers' activities.

fifty-six per cent of the net premiums, from January 1 to June 30, 1958 and Grand National received for the remainder of the years in issue about fifty-eight per cent of the net premiums by its reinsurance of the risks, the Commissioner's allocation of only fifty per cent of the net premiums to the taxpayers is reasonable.

The taxpayers argue that the finance companies did not earn the insurance commissions because they performed only routine paper work. Although it is our holding that the record supports the Tax Court's determination that the taxpayers did in fact earn the commissions, even if it was true that the finance companies did little to earn the commissions, it does not follow that the premium income should be regarded as belonging to the controlled insurance companies. However little the finance companies did to earn this money, they performed those minimal services which were the *sine qua non* of the insurance business. It cannot be seriously contended that Guardian or Grand National did anything that entitled them to a greater portion of the net premiums representing the commissions.

That the finance companies did not actually receive the premium proceeds which the Commissioner attributed to them does not prevent taxation. This proposition is settled by the assignment of income doctrine set forth in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L. Ed. 731 (1930).[6]

The taxpayers contend that the Commissioner's allocation is precluded by state law. Indiana law apparently forbids finance companies from receiving any income other than interest from loans, although there has been no judi-cial interpretation of the statutory language cited by the finance companies.[7] We are of the opinion that regardless of the status under Indiana law of the taxpayers' arrangements, the Commissioner is not precluded from making his allocation, since the criteria of what constitutes income under section 61 and the appropriateness of an allocation under section 482 are matters of federal law. Federal taxing statutes apply their own criteria of what constitutes income. In Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932), the Supreme Court observed: "Here we are concerned only with the meaning and application of a statute enacted by Congress, in the exercise of its plenary power under the Constitution, to tax income. The exertion of that power is not subject to state control. * * * State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation. dependent upon state law." None of the exceptions enumerated by the Court in *Burnet* which require invocation of state law are presented in the instant case. Section 482 by its terms makes no express reference to state law. If the taxpayers' state law argument is logically extended, it would lead to the erroneous conclusion that no income the payment or receipt of which is prohibited by state law can be included in gross income for federal income tax purposes. *See, e. g.,* James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961).

The final argument relied upon by taxpayers is that the Tax Court's decision conflicts with prior authorities. Specifically, the taxpayers cite Nichols Loan Corp. v. Commissioner, 21 T.C.M.

---

6. *See also* Kimbrell v. Commissioner of Internal Revenue, 371 F.2d 897, 902 n. 15 (5th Cir. 1967), where the fact that direct receipt of the income would probably have been illegal did not prevent the income from being taxed to the individual who earned and controlled it.

7. The taxpayers ground their state law argument on Indiana's Small Loan Law, Burns' Ind.Stats.Ann. § 18-3002 (1964) which provides in part:

In addition to the rate of interest or charges herein provided for no further or other charge or amount whatsoever for examination, service, brokerage, commission, expense, fee, or bonus or other thing or otherwise shall be directly or indirectly charged, contracted for, or received * * *.

805 (1962), rev'd, 321 F.2d 905 (7th Cir. 1963), Campbell County State Bank, Inc. v. Commissioner, 37 T.C. 430 (1961), rev'd, 311 F.2d 374 (8th Cir. 1963), and L. E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952). Although these cases closely resemble the ones before us, none of them is contrary to the result reached here. *Nichols* involved a loan and insurance arrangement whereby these activities were handled by two separate entities. Unlike the instant case, there was no finding by the Tax Court that the commissions would have been payable to the finance companies but for a special arrangement, deflecting them to the insurance partnership. Furthermore, there was no finding that the partnership had not earned the insurance commissions.[8] Finally, there was no finding in *Nichols* that the finance companies earned or controlled the disposition of the commission income although this court did hold that the cost of providing services in connection with the sale of insurance was an ordinary and necessary business expense deductible by the finance companies.

The *Campbell Bank* case presented a bank-insurance partnership relationship. The Tax Court rejected the Commissioner's contention that the insurance agency was a sham and refused to attribute its income to the bank. In the instant case there is no claim that the insurance companies are shams, but additionally the Tax Court found that the finance companies earned the commission income. Contrary to the facts before us, in *Campbell Bank* the Eighth Circuit specifically noted that the services performed by the bank in connection with the insurance were minimal. Additionally, the insurance company was the source of compensation for those people located at the bank who devoted their full efforts to the insurance work.

In the *Shunk* case, the Tax Court held that an allocation under the predecessor provision of section 482 was unreasonable because the price charged by taxpayers for their products to a controlled partnership distributor was fixed by the Office of Price Administration and could not have been raised to the level contained in the Commissioner's income allocation. The critical element in *Shunk* was that the taxpayer could not have raised its price, whether to a controlled or wholly independent distributor. Contrary to the taxpayers' assertion here, the *Shunk* case does not stand for the proposition that if a particular item of income cannot be legally earned on account of provisions of a nonfederal tax statute, it cannot be reported as federal taxable income. Section 482's predecessor was inapplicable in *Shunk* because there was no need to implement the section's policy of placing a controlled corporation on a parity with an uncontrolled one. The OPA regulations in *Shunk* prevented the generation of the income which the Commissioner sought to allocate; here Indiana law merely

8. We agree with Judge Tannenwald's observation in his concurring opinion in the Tax Court proceeding in the instant case:

In none of the cases relied upon by petitioners, with one possible exception, did the taxpayer in fact perform the services for which the allocated payments were made. In each, as petitioners themselves point out on brief, the taxpayer was simply in "the position to have performed the services for which the income was paid out but chose not to do so." At best, those cases stand for the proposition that the mere possibility of performance of services by the taxpayer does not sustain an allocation of payment by respondent. They do not hold that taxability cannot be imposed where the taxpayer actually performs the services. The possible exception is Nichols Loan Corporation of Terre Haute, T.C.Memo. 1962-149, reversed on other grounds 321 F. 2d 905 (C.A. 7, 1963). But it is significant that neither in the opinion of this Court nor that of the Court of Appeals was there any reference to section 482 and the opinion of this Court makes clear that its decision was based on a "consideration of all evidence." In any event, if that case can be viewed as requiring a contrary result herein, I would not follow it.

prohibited the receipt of the Commission income by the finance companies.

Since it is our holding that the decisions in Nos. 16840 through 16848 should be affirmed, we need not reach the issues raised by the Commissioner in Nos. 16849 and 16850.

The decision of the Tax Court is affirmed.

