JOHN J. THOMAS AND MARJORIE THOMAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thomas v. Commissioner
Docket No. 10098-80.
United States Tax Court
T.C. Memo 1983-462; 1983 Tax Ct. Memo LEXIS 325; 46 T.C.M. (CCH) 974; T.C.M. (RIA) 83462; August 9, 1983. Norbert J. Scheper, for the petitioners. Meno W. Piliaris, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1976 and 1977 in the respective amounts of $11,467.09 and $16,993.09. After concessions, the issues which we must decide are: (a) Whether respondent acted correctly in allocating to petitioners *326 additional gross income of $15,058 in 1976, and $15,759 in 1977, under the alleged authority of section 482; [1] or (b) In the alternative, whether, with respect to certain real property and improvements owned by petitioners, deductions for depreciation and other expenses should be disallowed on the grounds that (1) petitioners were not engaged in a trade or business with respect to such property, within the meaning of section 162, and (2) that petitioners were not holding such property as an investment or for the production of income within the meaning of section 212. [2]
FINDINGS OF FACT *327 Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners John J. Thomas (hereinafter "John") and Marjorie Thomas (hereinafter "Marjorie"), husband and wife, were residents of Cincinnati, Ohio, at the time their petition herein was filed. They filed their joint Federal income tax returns for the calendar years 1976 and 1977 on the cash basis with the District Director of Internal Revenue at Cincinnati, Ohio. On January 14, 1972, petitioners purchased some real property from unrelated parties, located at California, Kentucky. The property consisted of about 40 acres, and included a club house, a two-unit cottage, a barn and floating concrete boat docks in the Ohio River. The property had in excess of 2,000 feet of frontage on the Kentucky side of the Ohio River, approximately 23 miles upstream from Cincinnati, Ohio, and was served by a Kentucky State road. Prior to the purchase of this property by petitioners, it had been operated as a restaurant and commercial marina for small pleasure craft. The main building was a frame structure consisting of a kitchen, a private *328 area and a club and bar/dining area, with a total of 11 rooms, including one covered exterior porch. It had gas fueled steam heat. The cottage consisted of two rooms, with bathroom facilities and electricity, but without heat. The floating dock was located just offshore and parallel with the bank of the river, and provided docking facilities for small craft. Fuel, fresh water and electric hook-ups were available. The dock was in good condition and was typical of many other facilities of this nature located along the Ohio River. After their acquisition of the property, and at about the end of June, 1972, petitioners formed two corporations: (a) Holiday Club, Inc. (hereinafter "Club") was organized as a nonprofit, nonstock corporation under the laws of the Commonwealth of Kentucky. [3] The total capital contributed to this corporation was $500. From the time of its formation and during the years here in issue, the officers and directors were petitioners and their son, Ross Thomas. After its incorporation and at least through the years here in issue, Club occupied and operated a club/restaurant business on petitioners' property, under the name of Holiday Harbour. Its gross *329 income was derived principally from the sale of food and beverages, and from dues. (b) Petitioners also formed another corporation called Holiday Harbor, Inc. (hereinafter "Harbor") as a profit corporation under the laws of the Commonwealth of Kentucky. This corporation's only capitalization was $500, for which it issued all its outstanding capital stock, one-half to each petitioner. From the time of its formation through the years here in issue, its sole officers and directors were petitioners and their son, Ross Thomas. Harbor operated the boat dock facilities on petitioners' property from the time of its incorporation at least through the years here in issue, in the usual fashion of a small boat marina, under the name of Ohio Valley Yacht Club. Its gross income was derived principally from dockage charges, fuel sales, and, in its fiscal year ending March 31, 1977, from a casualty loss insurance recovery. The corporate returns filed by Club for its fiscal years ending January 31, 1976 through *330 January 31, 1978 reflect the following income and expense data: HOLIDAY CLUB, INC. DBA HOLIDAY HARBOUR
Fiscal Year Ended
1-31-76 1-31-77 1-31-78 Gross Receipts
$ 25,868 $29,733 $ 33,006 Less: Cost of Sales
20,054 19,291 16,196 Gross Profit
$ 5,814 $10,442 $ 16,810 Gross Rents
235 234 Dues
7,513 8,800 10,925 TOTAL INCOME
$ 13,327 $19,477 $ 27,969 Less Deductions
37,630 38,300 39,110 TAXABLE INCOME
$ (24,303)
(18,823)
$ (11,141)
The corporate returns filed by Harbor for its fiscal years ending March 31, 1976 through March 31, 1978 reflect the following income and expense data: HOLIDAY HARBOR, INC. DBA OHIO VALLEY YACHT CLUB
Fiscal Year Ended
3-31-76 3-31-77
$3-31-78 Gross Receipts
$ 3,636 Less: Cost of Sales
3,158 Gross Profit
$ 478 Rents Moorage
1,414 944
824 Insurance For Sunken Barge
30,000
TOTAL INCOME
$ 1,892 $30,944
$ 824 Less: Deductions
8,715 9,319
13,826 TAXABLE INCOME
$ (6,823)
$21,625
$ (13,002)
Respondent has made no adjustment to any of the above income and deduction *331 items, reflected in the returns of Club or Harbor for the periods indicated. From their inception and through the years here in issue, no leases existed between petitioners and Club and Harbor, respectively, with respect to petitioners' property which was being occupied and used by the two corporations, nor did either corporation pay any formal rent to petitioners on account of their respective use of portions of petitioner's property. In the calendar years 1976 and 1977, however, the two corporations made payments on behalf of petitioners and with respect to petitioners' property as follows: Nature Of
Year
Corporation
Payment
Amount
1976
Holiday Harbor, Inc.
Insurance
$1,275
1976
Holiday Club, Inc.
Insurance
5,381
1976
Holiday Club, Inc.
Real Est. Taxes
1,286
TOTAL
$7,942
1977
Holiday Harbor, Inc.
Insurance
$ 995
1977
Holiday Club, Inc.
Insurance
4,863
1977
Holiday Club, Inc.
Real Est. Taxes
1,373
TOTAL
$7,231
In each of their fiscal years 1973 through 1978, the two corporations had outstanding liabilities to petitioners for funds advanced by them to the corporations. The following tables show the outstanding *332 balances owed by each corporation to petitioners for monies advanced, as of the end of each respective fiscal year: HOLIDAY CLUB, INC.
Corporate Liability For
Loans From Petitioners
As Reflected On Forms 1120
Fiscal Year Ended
Filed By The Corporation
January 31, 1973
$8,075
January 31, 1974
28,643
January 31, 1975
49,553
January 31, 1976
90,105
January 31, 1977
95,760
January 31, 1978
100,848
HOLIDAY HARBOR, INC.
Corporate Liability For
Loans From Stockholders
As Reflected On Forms 1120
Fiscal Year Ended
Filed By The Corporation
March 31, 1973
$7,038
March 31, 1974
12,038
March 31, 1975
22,038
March 31, 1976
27,038
March 31, 1977
8,284
March 31, 1978
20,207
The above advances or loans by petitioners to the two corporations were made to assist each corporation in paying its operating expenses. In addition to permitting the two corporations to use their property without the payment of any formal rent, petitioners actively engaged in the operations of the two corporations, without compenstion. Petitioners would come to the property, usually on Thursdays, and stay through Sunday. While there, John *333 acted as the bartender in the Club, took care of the yard and the flower beds, and did odd jobs around the property which needed attention. [4]
Marjorie, on their weekend visitations, did the laundry for the bar/restaurant (aprons, napkins and tablecloths), did flower arrangements, acted as hostess in the clubhouse and occasionally took dinner orders if the regular cook/waitress was busy elsewhere. In addition to petitioners, there was a full time employed caretaker and dockmaster, and his wife, who served as the cook/waitress at the restaurant. Petitioners' son, Ross Thomas, also served as handyman and assistant dockmaster. Although petitioners had a boat which they kept tied up at the marina, they seldom used it, and were working at the club most of the time they were on the premises. Both corporations consistently showed net losses from their operations. The Oil Embargo of 1973 and the subsequent increases *334 in the cost of gasoline resulted in a decline in business at the marina and the club/restaurant, with the result that it became less probable that either Club or Harbor would be profitable. Also, in 1974, four of the marina's fifteen boat docks were sunk as the result of high water generated by a passing tug in the river, thus reducing the potential income that could be earned by Harbor from slip rents. At some undetermined point after the years here in issue, both Harbor and Club ceased operations.
In their joint income tax returns for the years 1976 and 1977, petitioners deducted the following items with respect to their property occupied by Club and Harbor: TOTAL
1976
1977
ITEM
AMOUNT
YEAR
YEAR
(1) Plumbing
$ 574
$ 574
(2) Supplies
332
332
(3) Depreciation
29,614
14,250
15,364
TOTALS
$30,520
$15,156
$15,364
The procedure followed by petitioners in the case of Club and Harbor -- locating a business, acquiring it, forming a corporation or corporations to operate the business, loaning money to these organizations to put the business on a sound operating basis, and then selling the corporation or corporations to a third party, while retaining *335 the underlying real estate on which petitioners intended to derive rent -- was a procedure which petitioners had successfully and profitably followed in the past with respect to other business enterprises. Petitioners did not except that either Club or Harbor would earn a profit until their fourth year of operation. When John purchased the property at California, Kentucky, he knew that improvements would need to be made which would involve a considerable investment in remodeling and changes. He retained ownership of the property and made the necessary changes himself, because he wanted to be able to take the accompanying expense deductions and depreciation in his own tax returns as the landlord. The fair market rental value, in the years in issue, of petitioners' property used by Club was $16,000 per year, and the fair market rental value of the property used by Harbor was $7,000 per year. [5]
In allocating additional rental income to petitioners on account of the use of their property by Club and Harbor under section 482, respondent reduced the total amount of $23,000 per year so allocated by the expenses which the two corporations paid *336 on petitioners' behalf -- $7,942 in 1976 and $7,231 in 1977 -- thus allocating to petitioners additional rental income of $15,058 in 1976 and $15,769 in 1977. [7]
Petitioners were engaged in a trade or business in 1976 and 1977, and both Club and Harbor were controlled by them. OPINION The primary issue between the parties here involves the propriety of respondent's action in determining additional gross income against petitioners for 1976 and 1977, based upon respondent's determination of a fair and arms-length rent which should have been charged by petitioners (but was not) for the use of petitioners' property by two corporations organized, controlled and operated by them, such reallocation of income by respondent being accomplished under the provisions of section 482. [8]
*337 As an initial matter, it is frequently necessary in cases of this type to determine whether the taxpayers among whom respondent has reallocated gross income, deductions or credits are (a) under common control and (b) are each engaged in a trade or business, so as to bring them within the reach of section 482. No such problems are presented in the instant case. As the facts show, both Club and Harbor were controlled and operated by petitioners, so that the element of common control is established. Further, the parties are in agreement that petitioners were engaged in a "trade or business," at least within the meaning of section 482. Although such agreement between the parties on a mixed question of fact and law such as this would not be necessarily binding upon this Court, it is clearly correct in this case. Petitioners' activities in allowing the use of their property by Club and Harbor, together with petitioners' personal services in forwarding the marina and club enterprises, clearly puts them in a "trade or business" within the meaning of the applicable statute. , affd. , cert. *338 denied ; , affd. ; . The purpose and extent of section 482, and the standard to be used by respondent in applying its provisions, is succinctly stated in respondent's regulations. [9] This Court has also said: Its [section 482] purpose is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer; hence the standard to be applied is that of an uncontrolled taxpayer dealing at arm's-length with another uncontrolled taxpayer. * * * Section 482 vests the Commissioner with broad discretion, and his determinations in applying such section must be upheld unless the taxpayer establishes that such determinations are unreasonable, arbitrary, or capricious. [
*339 See also ;; , affg. . Petitioners argue that respondent's action in reallocating rental income to them from Club and Harbor, based upon the admitted fair rental value of such properties, was, despite capricious and therefore erroneous. To support this position, petitioners advance several arguments: (a) Petitioners argue that, even though they permitted Club and Harbor to use their property without the payment of any rent (other than the taxes and insurance with respect to the proprty which the two corporations did pay and which respondent has duly taken into consideration), it should still be held that the controlled entities here were dealing at arms length, since the two corporations involved were in such financial straits that they could not afford to pay any more rent. We find this arument unconvincing. First, it is clear to us that petitioners would not have allowed an outside unrelated party *340 the use of their property to carry on a business enterprise, in return for nothing more than the payment of insurance and real estate taxes with respect to such property. This record indicates that John was a versatile, knowledgeable, and energetic businessman, and we do not think he would have entered into this arrangement, dealing at arms length with an uncontrolled and independent entity. If his "lessees" could not have paid the rent, he would not have rented the property to them. Second, it does not appear from this record that Club and Harbor in fact were unable to pay the additional amounts which respondent has determined, and which the parties have stipulated was a fair arms-length rent. Petitioners urge that the two corporations were unable to pay the additional rent, as determined by respondent, because they were "insolvent" during the period in question. Insolvency, however, is not the test and does not equal inability to pay. The test, rather, is more accurately whether the corporations had sufficient gross income to pay such rent during the periods in question. Our findings of fact show the gross income derived by each of the two corporations during their three *341 fiscal years which encompass the calendar years 1976 and 1977 which are in issue herein. A proration of such gross income, on an equal monthly basis, to the calendar years 1976 and 1977, indicates that Club had a gross income of almost $19,000 in calendar year 1976, and a gross income of slightly more than $27,000 in calendar year 1977. Likewise, Harbor had a prorated gross income for calendar year 1976 of $23,681, and, for 1977, a gross income of $8,354. Against these gross income figures, respondent allocated $9,333 of additional rental income from Club to petitioners for 1976, and $9,764 for 1977 (in both cases, after subtracting payments made by Club for petitioners' benefit). In the case of Harbor, respondent allocated an additional $5,725 to petitioners for 1976, and $6,005 for 1977 (again after giving credit for the expenses paid on petitioners' behalf by the corporation). Such allocations of additional gross income by respondent from the two corporations to petitioners were thus clearly less than their gross income available for the payment of business expenses in the periods involved. We are accordingly not faced here with the type of situation where it appeared *342 that the imputed "payor" simply did not have enough money from any source to pay the gross income reallocated by respondent, see ; (on appeal 3d Cir.). We do not have the situation where respondent appears to be "creating income," where no gross income exists to satisfy such an allocation. In the instant case, it is clear that it was the very use of petitioners' property which enabled the two corporations to produce the gross income which was realized, cf. , so that we do not have to confront the problem which was faced in , affd. ; and , affg. . Rather, we think this case is entirely comparable to where a reallocation of rent under section 482 by respondent was approved by this Court, where the record showed that *343 there was sufficient gross income to support the allocation, even though the controlled corporation from whom the gross income was allocated had no net income. See also We think it is clear that insolvency is not the proper test to be applied here, but rather whether there was sufficient gross income to support respondent's reallocation. Compare , cert. denied . Respondent's authority under section 482 is to reallocate gross income, not net income, and that is what was done here. [10]
*344 Finally, we note that any alleged inability to pay on the part of Club and Harbor would have been due, in no small measure, to petitioners' own actions. Both corporations were miserably undercapitalized (only $500 apiece), and petitioners apparently kept them alive by doling out money, in the form of advances, to pay necessary bills. Under the arms-length standard prescribed by section 482, petitioners cannot just advance enough money to pay the bills they want to see paid, and then claim "inability to pay" as to expenses they do not want to pay. (b) Petitioners further complain that respondent's action here should be held to be arbitrary and capricious, since, they say, if they had not organized Club and Harbor but had conducted the entire business enterprise themselves, they would not have incurred any liability for arms-length rental income, but would still have had the depreciation and expense deductions which they claimed in their returns. The answer to this is that petitioners, having chosen to use the device of two controlled corporations as they did, must accept the tax consequences of such choice and may not enjoy the benefit of some other route that they might have *345 chosen to follow but did not. ; . See also We conclude, therefore, that the dealings between petitioners and their controlled corporations were not at arms length, that all parties were controlled entities, and that respondent's reallocation of an admittedly fair rental value to petitioners for the use of their property was proper under the circumstances. ;;
Having decided this first issue in favor of respondent, it is unnecessary to consider the second issue, as raised by respondent's amended answer. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all statutory references herein are to the Internal Revenue Code of 1954, as in effect in the years in issue; and all Rule references are to the Rules of Practice and Procedure of the Tax Court. ↩
2. This alternative issue was raised by respondent by amended answer, and respondent bears the burden of proof in respect thereto, Rule 142(a). Respondent has conceded that his position on this issue is inconsistent with his position on the first issue, and that if said first issue is decided in respondent's favor, he will abandon his position on the second issue.↩
3. Although so organized, Club, from its inception and through its fiscal year ending January 31, 1978, filed Federal corporation income tax returns on Form 1120 as a fully taxable corporation.↩
4. John's activities on behalf of the two enterprises may not have been an entirely unmixed blessing. As the regular cook/waitress at the bar and restaurant testified, "* * * he was usually washing down the front of the building which I hollered at him often."↩
5. The parties so stipulated.↩
7. Respondent's original determinations were in higher amounts, but were reduced pursuant to the stipulation of the parties as to the fair rental value.↩
8. Section 482 reads as follows: SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more oganizations, trades, or businesses (whether or not incorpoated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
9. Regulations section 1.482-1 provides in part: "(b) Scope and Purpose.
(1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the District Director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any time or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Subsection (c) of the same regulation provides: "(c) Application.↩ Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid or escape taxes. In determining the true taxable income of a controlled taxpayer, the District Director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."
10. In so holding, we are not unmindful of the case of Tennessee- ↩, reversing an unpublished Board of Tax Appeals opinion. This case was decided by the Court of Appeals for the Sixth Circuit, to which an appeal in this case would lie. We think, however, that such case is distinguishable from the instant case, for the reasons more fully set forth in our opinion in . See also , affd. .