JOSEPH PROCACCI AND TERESA PROCACCI, ET AL.,[1]
PETITIONERS v. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 5170-82, 5787-82,     Filed March 13, 1990.
4538-84.

*John J. Cunningham III, Alan M. Lieberman,* and *Richard D. Birns,* for the petitioners.
*Thomas E. Crowe,* for the respondent.

PARKER, *Judge:* In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax as follows:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 5170-82 | Joseph and Teresa Procacci | 1976 | $10,728.00 |
| 5787-82 | Michael and Frances Procacci | 1976 | 24,224.00 |
| 4538-84 | Angelo Penza | 1978 | 6,959.00 |
| | | 1979 | 9,310.16 |

Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The above deficiencies arise out of adjustments made by respondent under section 482. The issues for decision are:

---

[1]The cases of the following petitioners have been consolidated with this one: Michael Procacci and Frances Procacci, docket No. 5787-82; and Angelo Penza, docket No. 4538-84.

(1) Whether a section 482 adjustment is appropriate in this case, and if so, (2) the proper amount of such adjustment.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Joseph Procacci and Teresa Procacci, husband and wife, resided in Pennsauken, New Jersey, at the time they filed their petition in this case. Petitioners Michael Procacci and Frances Procacci, husband and wife, resided in Cherry Hill, New Jersey, at the time they filed their petition in this case. Petitioner Angelo Penza resided in Voorhees, New Jersey, at the time he filed his petition in this case. For convenience, petitioners Joseph Procacci, Michael Procacci, and Angelo Penza will hereinafter be referred to as "petitioners."

For sometime prior to 1971, Old Dutch, Inc., a New Jersey corporation, had owned and operated a golf course, clubhouse, and related facilities located at Himmelein Road, Medford Township, New Jersey, and known as the Sunny Jim Golf Club. The Sunny Jim Golf Club was located on a parcel of land containing 151 acres (the golf parcel). In addition to the golf course itself, the golf parcel contained a brick clubhouse, a masonry garage, and parking facilities. Old Dutch, Inc. also owned a separate contiguous parcel of land consisting of approximately 5 acres and containing a 2-½ story frame dwelling, a frame garage, a masonry garage, and a masonry building (the 5-acre parcel). Finally, Old Dutch, Inc. owned an additional parcel of vacant land located approximately 2 miles from the golf parcel and containing approximately 100 acres (the 100-acre parcel).

The Sunny Jim Golf Club had been established and developed by a golfing enthusiast, James Himmelein, who prided himself on the fact that few, if any, players could break par on that course. In 1971 and throughout the years here relevant, the golf course had 18 golf holes with a total par of 72. The length of the course was 7,100 yards, 6,503 yards, and 5,232 yards from the blue, white, and red tees, respectively. There were 64 sand bunkers and 108,000 square feet of greens. Irrigation was by manual pop-up

heads throughout the course. There was a clubhouse with 6,000-8,000 square feet and a dining room capacity of approximately 100.

The Sunny Jim Golf Club was located in an area of New Jersey that was relatively sparsely populated. According to the U.S. Census Bureau, Burlington County, in which the club was located, had a population density in 1970 of 394 persons per square mile while contiguous, more urbanized Camden County had a density of 2,064 persons per square mile. In 1975, these figures had increased to 422 and 2,156, respectively. The population within a 10-, 20-, and 30-mile radius of the golf course in 1970 and 1980 was as follows:

|      | *10 Miles* | *20 Miles* | *30 Miles* |
|------|-----------|-----------|-----------|
| 1970 | 178,382   | 2,330,020 | 4,376,780 |
| 1980 | 242,344   | 2,245,290 | 4,195,140 |

The following additional public and private golf courses were located within a 10- or 20-mile radius of the Sunny Jim Golf Club throughout the years in issue:

### TEN MILES

| *Course name* | *Location* | *Public/ private* | *Golf holes* |
|---------------|-----------|-------------------|--------------|
| 1. Burlington County C.C. | Mt. Holly, NJ | Private | 18 |
| 2. The Golf Farm | Gibbsboro, NJ | Public | 18/9 |
| 3. Evesham G.C. (formerly Indian Springs) | Mt. Laurel, NJ | Public | 18 |
| 4. Links at Kings Grant | Marlton, NJ | Private | 18 |
| 5. Little Mill | Medford, NJ | Public | 27 |
| 6. Medford Lakes C.C. | Medford Lakes, NJ | Private | 18 |
| 7. Merchantville C.C. | Cherry Hill, NJ | Private | 9 |
| 8. Moorestown F.C. | Morrestown, NJ | Private | 9 |
| 9. Ramblewood C.C. | Mt. Laurel, NJ | Private | 9/9/9 |
| 10. Tavistock C.C. | Haddonfield, NJ | Private | 18 |
| 11. Woodcrest C.C. | Cherry Hill, NJ | Private | 18 |
| 12. Golden Pheasant C.C. | Lumberton, NJ | Public | 18 |

### TWENTY MILES

| | | | |
|---------------|-----------|-------------------|--------------|
| 13. Blackwood C.C. | Blackwood, NJ | Public | 18 |
| 14. Pennsauken C.C. (formerly Iron Rock) | Pennsauken, NJ | Public | 18 |
| 15. Pine Valley C.C. | Clementon, NJ | Private | 18 |
| 16. Pitman Golf Club | Pitman, NJ | Public | 18 |
| 17. Rancocas C.C. | Willingboro, NJ | Public | 18 |
| 18. Riverton C.C. | Riverton, NJ | Private | 18 |
| 19. Tall Pines C.C. | Sewell, NJ | Public | 18 |

| Course name | Location | Public/ private | Golf holes |
|---|---|---|---|
| 20. Wedgewood C.C. | Turnersville, NJ | Public | 18 |
| 21. Woodbury C.C. | Woodbury, NJ | Private | 12 |
| 22. Ashbourne C.C. | Cheltenham, PA | Private | 18 |
| 23. Melrose C.C. | Cheltenham, PA | Private | 18 |
| 24. Roosevelt C.C. | Philadelphia, PA | Public | 18 |
| 25. Torresdale-Frankford C.C. | Philadelphia, PA | Private | 18 |
| 26. John F. Byrne G.C. | Philadelphia, PA | Public | 18 |
| 27. Juniata G.C. | Philadelphia, PA | Public | 18 |
| 28. Walnut Lane G.C. | Philadelphia, PA | Public | 18 |

Almost all of these other golf courses are closer to the more densely populated portions of the region than is the Sunny Jim Golf Club.

James Himmelein had certain attitudes that affected the operation of the golf course. He would not allow women either on the course or in the clubhouse. He would not allow those whom he considered inferior golfers to play the course and went so far as to eject from the premises persons whose play displeased him.

As a result of the factors regarding design and location of the golf course, the available population, the number of competing courses, and Mr. Himmelein's peculiarities, the operation of the Sunny Jim Golf Club lost money in every year at least from 1964 through 1969. Its financial results for those years were as follows:

| Year ended | Net income or (loss) |
|---|---|
| 5/31/64 | ($76,067.81) |
| 5/31/65 | (55,170.00) |
| 5/31/66 | (50,744.35) |
| 5/31/67 | (35,962.39) |
| [1]2/29/68 | (35,509.05) |
| 5/31/69 | (234,110.05) |

[1] For 9 months ending on this date.

As a result of these losses, in December 1969 Old Dutch, Inc. voluntarily went into bankruptcy under Chapter XI of the Bankruptcy Act. Thereafter, a receiver was appointed to operate the golf course business.

According to the summary of debts and assets submitted to the bankruptcy court, the assets and liabilities of Old Dutch, Inc. at the time of its bankruptcy were as follows:

### ASSETS

| | |
|---|---:|
| Cash | $203 |
| Accounts receivable | 4,890 |
| Real estate | 425,000 |
| Stock in trade | 125,000 |
| Total | 555,093 |

### LIABILITIES

| | |
|---|---:|
| Wages | 71,698 |
| Taxes | 65,697 |
| Secured claims | 760,000 |
| Unsecured claims | 131,270 |
| Total | 1,028,665 |

In December 1970, the creditors of Old Dutch, Inc. petitioned the bankruptcy court for a forced sale of the assets of the corporation. The petition was based on the belief of both the creditors and the receiver that it was not in the best interests of the creditors to continue the operation of the golf course. On December 29, 1970, the bankruptcy court ordered that the assets of Old Dutch, Inc. be sold by sealed bid on February 2, 1971.

In December 1970, the course was in very poor condition—"like a cow pasture because of neglect." Although Himmelein had kept it in fairly good repair, the course had seriously deteriorated during the time it was operated by receivers, and attracted the "lowest end" of golfers.

At this time, Michael Procacci lived in Pennsauken, New Jersey, approximately 12 miles from, and played at, the Sunny Jim Golf Course. When he learned that the course was going to be sold in bankruptcy, he asked the receiver about the price and terms of sale. Procacci then organized the group that ultimately became Medford Associates. In January 1971, acting as agent for the Medford Associates (which was to be formed), Procacci entered into an agreement of sale to purchase the real and personal property of Old Dutch, Inc. for $1,100,000 cash. This purchase price was sufficient to pay all creditors of Old Dutch, Inc. in full and leave approximately $65,000 for the expenses of administration. Old Dutch, Inc. was unrelated to Medford Associ-

ates or its partners. Because it was not certain that an equal price could be obtained under the sealed bid procedure, the bankruptcy court approved the sale to Medford Associates.

Medford Associates, a general partnership organized and operated under the Uniform Partnership Act as in force in the State of New Jersey (Medford Associates), was formed in March of 1971. It had 15 partners at its inception, 10 in 1976, and 9 in 1978 and 1979. The partnership agreement, dated March 25, 1971, stated that the partnership's purpose was "to own, improve, lease, manage and operate buildings and other real estate." During the years in issue, petitioners were partners in Medford Associates.

The shares of Medford Associates' income and loss under the partnership agreement as in effect in 1976 for Joseph Procacci and Michael Procacci were 0.1244 and 0.2487, respectively. Angelo Penza's share of Medford Associates' income and loss for 1978 and 1979 was 0.1293. Medford Associates has consistently used the cash method of accounting and the calendar year for both financial and Federal income tax reporting purposes.

Following the bankruptcy court's approval of the sale, Michael Procacci, in confirmation of the agency relationship under which he had entered the agreement of sale, assigned his rights under the agreement to Medford Associates. The partnership paid for the above-described properties in cash, from a combination of the partners' initial capital contributions and a bank loan. The initial capital contributions were, in the aggregate, $420,000. The loan was made to the partnership and to its partners individually by the Industrial Valley Bank & Trust Co. of Pennsylvania. The loan, dated March 26, 1971, was in the amount of $700,000, bore interest at the annual rate of 9 percent, and was payable within 5 years. It was secured by a mortgage covering the golf parcel, the 5-acre parcel, and the 100-acre parcel.

When the partnership acquired these properties, it intended to improve the 100-acre parcel for residential development and to turn the golf course into a profitable business. At that time, however, the 100-acre parcel was zoned in a classification that did not permit development for commercial or residential uses. The partnership immedi-

ately commenced efforts to obtain a rezoning of the 100-acre parcel in order to permit such development. The partnership felt that the successful operation of the golf course would increase the development value of the 100-acre parcel. The partners intended to restore and improve the golf course into championship status. In addition, the partners believed that, if they encountered serious adversity, they could develop part of the golf course for commercial or residential uses.

In March 1971, the partners of Medford Associates formed a New Jersey corporation under the name Medford Village Resort & Country Club, Inc. (the corporation). Eight hundred and eighty-two (882) shares of common stock, $1 par value, were issued to the partners of Medford Associates for $1 per share in proportion to their partnership interests. On March 26, 1971, the partnership leased the golf parcel to the corporation. The lease included the improvements located on the golf parcel as well as the golf-related personal property that had formerly been owned by Old Dutch, Inc. in its operation of the Sunny Jim Golf Club. Between the date of the lease and the years in issue, Medford Associates purchased and constructed other assets for use, and which the corporation used, in connection with the operation of the golf parcel. During the years in issue, the corporation owned 72 electric golf carts for use on the golf course.

The lease had an initial term of 5 years, commencing on March 26, 1971, and was automatically renewable from year to year thereafter unless canceled. The lease called for rental of $60,000 for the first year, subject to renegotiation for each succeeding year, but never to be less than $60,000. Clause 28 of the lease provided as follows:

28th: It is agreed and understood that the rent for and during the first year of the term hereof has been fixed below the fair market value of the leased premises for the convenience of the Tenant. The rent for each succeeding year of the term is to be renegotiated and adjusted on or before January 1 of each year to reflect the current fair market rental value of the leased premises. In the event that a rent satisfactory to the Landlord cannot be agreed upon, the lease shall expire as herein provided.

The $60,000 amount was an arbitrary figure suggested by petitioner Michael Procacci's attorney.

When Medford Associates acquired these properties, none of its partners had any experience in operating a golf course. Initially, one of the partners, William Tesone, managed the golf course operation. Mr. Tesone had a background in both the restaurant and music businesses. Tesone managed the golf course and country club for a few years until he left to go into another restaurant business. After an outside manager was hired and then dismissed for stealing money, Michael Procacci became the manager of the golf course and country club sometime during 1977 or 1978.

The proper operation of the golf parcel as a golf, tennis, and general recreation club required that a license be obtained to serve alcoholic beverages on the premises. However, it proved to be impossible, under New Jersey law, to obtain such a license in the name of a business entity such as Medford Associates or the corporation. To obtain the liquor license, a New Jersey nonprofit corporation was formed under the name Medford Village Resort & Country Club (Nonprofit) Corp. (the club). In an agreement dated August 30, 1971, the corporation subleased to the club the clubhouse portion of the golf parcel excluding the pro shop and other areas used solely or primarily for the maintenance of the golf course. The initial term of the sublease was from the date of its execution through November 30, 1972. The sublease was renewable from year to year for additional 1-year terms until canceled. Rent under the sublease was $2,000 per month for the initial term and was to be renegotiated to reflect fair market rental value for each subsequent renewal term. As was true of the lease from Medford Associates to the corporation, the sublease to the club provided that the rent for the first year was "fixed below * * * fair market rental value * * * for the convenience of the Tenant."

Under its bylaws, the club was managed by a board of trustees. Trustees were elected annually by the members of the club. Members were those persons who had been nominated for membership by a membership committee and approved by the board of trustees. In 1971, immediately

after its formation, the club obtained over 100 voting members and has had at least that many voting members throughout the period here relevant.

In 1971 dues for membership in the club were set as follows:

| | |
|---|---|
| Family full membership | $450 per year |
| Individual full membership | 350 per year |
| Regular membership | 50 per year |
| Social membership | 25 per year |

Full membership entitled the member to voting rights in the club, starting time privileges and exemption from the payment of green fees on the golf course, and the social activities of the club. Regular membership entitled the member to starting time privileges, a $1 discount on green fees, and the social activities of the club. Social membership entitled the member only to the social activities of the club. Nonmembers were permitted to use the golf course upon payment of green fees but were not entitled to use the restaurant and bar. Green fees were $7.50 on weekends and holidays and $5 on weekdays. Golf carts were available for $9.50 but were not mandatory. During the period from 1971 through 1979, dues for membership in the club and fees did not vary significantly.

Although it was a nonprofit corporation, the club did not seek status as a tax-exempt organization under section 501(a). Thus, in each year from 1971 through the years in issue the club filed a U.S. Corporation Income Tax Return (Form 1120). The corporation and the club have consistently used the accrual method of accounting and the calendar year for both financial and Federal income tax reporting purposes.

From 1971 through 1979, Medford Associates suffered aggregate net losses in the amount of $1,462,657, due to the facts that it paid interest on the purchase-money loan and all real estate taxes, incurred depreciation on the improvements related to the golf course, and received no rent from the corporation and club. Over this period, Medford Associates' cash-flow from operations was a deficit of $1,147,192, and it advanced a net amount of $130,026 to the corporation and club. During the same period, the corporation and club suffered aggregate net losses in the amount of

$14,118.75, and the cash-flow from operations, including amounts expended for replacing golf carts and golf cart batteries, was a deficit of $105,366. See the appendix for a detailed presentation of financial data from the financial statements and the tax returns of Medford Associates and the corporation and club.

Through payment of expenses to unrelated third parties from operating funds during the years 1971-79, the corporation exhausted operating funds available to pay rent to Medford Associates during those years. As a result, despite having gross income in excess of the rental adjustment proposed by respondent, the corporation paid no rent to Medford Associates during those years. Notwithstanding the nonpayment of rent, Medford Associates permitted the corporation to remain in possession of the golf parcel.

Similarly, for the period 1971-79, the expenses payable by the club to unrelated third parties have exceeded its available operating funds and the club did not pay rent, during the years in issue, to the corporation under the sublease. Nevertheless, the corporation allowed the club to remain in possession of the subleased premises.

Even though the golf course and club operation was losing money, the principals of Medford Associates and the corporation continued it because they believed that they could eventually make it profitable in view of the golf course's reputation as a good one if properly maintained. They realized it would take some time to rid the facility of the stigmas of bankruptcy and its former poor condition. When Michael Procacci became manager in 1977 or 1978, he changed the golf course from public to private. As a result, the operation thereafter attracted better golfers and other clientele, and began to improve. The golf course is presently earning a profit, has a waiting list of people seeking membership, and is paying rent to Medford Associates of $60,000 per year.

The golf course is now rated by the Golf Association of Philadelphia as the third most difficult in the Delaware Valley (including southern New Jersey, southeastern Pennsylvania, and northern Delaware). It is third after Pine Valley Country Club in Clementon, New Jersey, and the east course at Merion Golf Club in Ardmore, Pennsylvania.

As previously stated, after acquiring the Old Dutch, Inc. properties, Medford Associates immediately commenced efforts to obtain a rezoning of the 100-acre parcel in order to permit development for commercial or residential uses. After some 4 years of litigation from 1973-77, Medford Associates succeeded in obtaining a change in zoning. In 1978 the partnership realized a substantial gain when it sold the 100-acre parcel for residential development at a price of $900,000.

When Medford Associates purchased it in 1971, the golf parcel was not ready for development. In 1976, its practical potential for development was still 10 to 15 years off. Immediately after the sale of the 100-acre parcel, the partnership commenced efforts to develop a portion of the golf parcel. Medford Associates has been seeking approval to construct 111 condominium townhouse units on a portion of the golf course consisting of approximately 18.5 acres, which is now used as a practice driving range. Such zoning approval would be conditioned on the partnership's agreement to restrict the remainder of the golf parcel from development for 99 years. Thus, the 111 units represent the full practical development potential of the golf parcel.

Development of the 100-acre parcel as well as potential development of the golf parcel was made more difficult by severe restrictions on development in the area in which the land was located. These restrictions were imposed by both the State of New Jersey and local governments.

Throughout the years in issue, Medford Associates has sought to rent or lease the frame dwelling located on the 5-acre parcel to unrelated parties for residential purposes. These efforts were unsuccessful until 1978. In 1978 and 1979, however, the dwelling and immediately surrounding land (but not the entire 5 acres) was rented to unrelated parties, and receipts from such rental was realized in those years in the respective amounts of $2,400 and $4,725.

There are three general methods of valuing property. Each method has its analog in valuing the rental value of the property.

The first method can be called the "Cost of Reproduction/ Return on Assets" method. Under this method, the rental value is determined by multiplying the cost of reproducing

the rented property by a market return on investment that the lessor could theoretically obtain through other investments. In the case of golf courses, however, this method is irrelevant and has no impact on rental value because a golf course and related equipment are costly and cannot normally generate the amount of income produced by other assets of similar value. This method entails valuing land and improvements in which a lessee has no interest. The only source of a lessee's profit is the excess of operating revenues over operating expenses, which bears little relation to the replacement cost or value of the golf course. Also, many golf courses are constructed for reasons other than obtaining a market rate of return through their operation. For example, there are nonprofit recreational clubs supported by private members. Also, many clubs are a part of larger commercial, residential, recreational, or mixed real estate developments. These golf courses increase the marketability and value of surrounding property, even if they cannot produce a market rate of return (or any rate of return) from their own operations. Thus, a developer who builds a golf course as part of a larger real estate development may lease it to a third party or otherwise operate it so that he receives little or no return. Sometimes, such golf courses are leased to operators for nominal or no consideration. However, the developer may have in effect received his return through sale and/or leases of surrounding real estate at greater values than would have been possible had the golf course not been built.

The second approach to valuation is known as the "Market Comparison" method. This method compares rents paid under leases of property similar to the subject property. However, there are major problems involved in using this approach. First, it is not common for golf courses to be leased, so there are few comparisons available. Second, it is difficult to determine comparability because, aside from the land, improvements, and equipment that would be considered in a sale transaction, one must also consider the terms of the lease. For example, a lease may contain an option to purchase the golf course, so that the stated rent may constitute part payment for the option.

The third method of determining rental value is the "Income" method. Under this method, the cash-flow profit that a golf course will generate over the term of the lease from operations is projected based upon the amount of income historically produced, and upon its future income-generating potential based upon factors such as course layout, population of the surrounding area, length of the golfing season, whether the course is public or private, its level of difficulty, and maintenance costs. This cash-flow profit is the amount available from which lease payments are made to the lessor, and any net profit is derived by the lessee. This is the appropriate method to use in determining the amount of rent that an unrelated lessee would pay for the use of a golf course.

Generally, a golf course owner/lessor's first priority is proper maintenance of the golf course, as against income from the lease. The owner/lessor seeks a strong guarantee that the lessee has the financial capacity to overcome disasters and operate the golf course in a manner adequate to maintain it in good condition. Deterioration of the golf course reduces the level of play which in turn reduces the operator's ability to maintain the course. Such conditions on many occasions have led to a golf course operation going bankrupt. In situations in which a lessee does not realize the revenues projected under the lease, it is not unusual for the lessor to reduce the rent or forgive it outright in order to keep the golf course at an adequate level of maintenance. If the rental payments are allowed to become excessive in view of revenues realized, usually maintenance of the golf course will suffer, and the ultimate result will be that there will be no lease payments of any kind. In some cases, the lessee will actually abandon the golf course and "let it grow up," i.e., cease all maintenance activities. A golf course operation that has failed can usually be expected to require 8 to 9 years to recover economic health.

Medford Associates reported a loss on its 1976 partnership return in the amount of $184,713.[2] Joseph Procacci and Michael Procacci's shares of the reported loss were $22,978

---

[2]The $2,000 difference between this figure and the one shown in the table in the appendix is attributable to additional first-year depreciation that was reported separately from ordinary loss on the return, but not on the financial statements. ($184,713) − $2,000 = ($186,713).

and $45,939, respectively. Medford Associates reported losses on its 1978 and 1979 returns in the respective amounts of $125,527[3] and $67,774.[4] Angelo Penza's shares of the reported losses for those years were $16,231 and $8,763, respectively. As a result of audits of Medford Associates for 1976, 1978, and 1979, respondent determined increases in its gross income in the amounts of $147,033, $117,531, and $108,696, respectively. The increases resulted solely from respondent's imputing rental income from the corporation to Medford Associates under section 482.[5]

Respondent's determination of the amount of rental income imputed to Medford Associates was based on sec. 1.482-2(c), Income Tax Regs., and was computed as follows:

|  | 1976 | 1978 | 1979 |
|---|---|---|---|
| Allowable depreciation per partnership return | $66,017 | $71,363 | $55,261 |
| Three percent (3%) of depreciable basis of property ($884,195, $973,389, and $1,046,583, respectively) | 26,526 | 29,202 | 31,397 |
| Direct expenses (excluding interest) (taxes per partnership return) | 54,490 | 16,966 | 22,038 |
| Total rental allocation under sec. 482 and sec. 1.482-2(c), Income Tax Regs. | 147,033 | 117,531 | 108,696 |

These increases in the partnership's income resulted in the deficiencies determined against petitioners.

---

[3]The $217,588 reported installment of gain on sale of the 100-acre parcel and $2,000 additional first-year depreciation were separately stated in the return from the ordinary loss figure. ($125,527) − $2,000 + $217,588 = $90,061, which is the amount of net income shown on the financial statements. See Appendix A p. 436.

[4]The $92,438 reported installment of gain on sale of the 100-acre parcel, and $2,000 additional first-year depreciation were separately stated in the return from the ordinary loss figure. ($67,774) − $2,000 + $92,438 = $22,664, the amount of net income shown on the financial statements. See Appendix A p. 436.

[5]The deficiencies determined in the original notice of deficiency issued to petitioner Angelo Penza were based on factual and legal issues other than sec. 482. The petition disputed the notice, but did not mention sec. 482. Respondent's answer admitted and denied the petition's allegations in summary fashion, again without reference to sec. 482. Finally, about a month before trial, respondent amended his answer to raise the sec. 482 issue. The parties now agree that the factual and legal issues in the deficiency notice were raised in error, and that the sec. 482 adjustment is the sole basis for the deficiencies determined against Angelo Penza.

OPINION

The issue is whether rental income should be allocated from the corporation and club to Medford Associates under section 482, and, if so, the amount of rental income to be allocated. Section 482 provides in relevant part as follows:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Amplifying this grant of broad powers are regulations defining the objective of section 482 and dealing specifically with leases of property between commonly controlled organizations.[6]

Section 1.482-1(b)(1), Income Tax Regs., states that "The purpose of section 482 is to place a controlled taxpayer on a

---

[6]We agree with respondent that the corporation and club should be considered under common control and viewed as a single entity for purposes of our sec. 482 analysis. The following considerations compel this conclusion:

1. The only reason the club was formed was to enable alchoholic beverages to be served on the premises. Thus, its existence stems solely from the need to comply with the formalities of New Jersey law;

2. Although it is not clear from the record who executed the club's organic documents (Articles of Incorporation and Bylaws), the sublease from the corporation to the club was executed by Michael Procacci for the corporation and William Tesone and Alfred Squitire for the club. Procacci, Tesone, and Squitire were all partners of Medford Associates at the time;

3. Financial reporting for the corporation and club was on a combined basis. The notes to these financial statements provided as follows:

Medford Village Resort & Country Club, Inc. a corporation chartered under the * * * laws of the State of New Jersey, and Medford Village Resort & Country Club, Inc., a corporation chartered as a nonprofit corporation under the laws of the State of New Jersey, are interrelated companies operating joint country club and restaurant facilities at Medford, New Jersey. Medford Associates is a related partnership which owns the facilities. Inter-company balances have been eliminated in combination.

4. The notes to Medford Associates' financial statements provided as follows:

The company is a partnership organized under the laws of the State of New Jersey. It owns country club buildings and facilities which it rents to two related corporations, both named Medford Village Resort & Country Club, Inc., one chartered as a business corporation and the other as a non-profit corporation.

tax parity with an uncontrolled taxpayer." The touchstone or standard "in every case" for determining "the true taxable income" of a controlled taxpayer is "that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Section 1.482-1(a)(6), Income Tax Regs., defines "true taxable income" as follows:

> The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. * * *

The Secretary's authority under section 482 is not restricted to the case of improper accounting, or sham, or other transactions lacking economic substance, but extends to:

> any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an *uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [Emphasis supplied.]

Sec. 1.482-1(c), Income Tax Regs; *Latham Park Manor, Inc. v. Commissioner,* 69 T.C. 199, 210 (1977), affd. without published opinion 618 F.2d 100 (4th Cir. 1980).

Thus, the determination under section 482 is essentially and intensely factual.[7] The question in every case is what

---

5. Petitioners' expert, Cecil McKay, based his analysis of the amount of rent that Medford Associates would have received upon the Corporation and Club's combined financial statements. See *infra* note 12, and accompanying text.

[7]Because of the heavy burden on the taxpayer in the usual sec. 482 case, the burden of proof may become important. We have taken a three-tiered approach to burden of proof. If the notice of deficiency raises the sec. 482 issue, the taxpayer has the burden to prove that respondent abused his discretion, i.e., that respondent's allocation was "unreasonable, arbitrary, or capricious." *Achiro v. Commissioner,* 77 T.C. 881, 891 (1981); *Boyer v. Commissioner,* 58 T.C. 316, 327 (1972); *Ach v. Commissioner,* 42 T.C. 114, 126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966). If respondent does not indicate in the notice that he relies on sec. 482, but so informs the taxpayer by pleadings far enough in advance of trial to avoid prejudice to the taxpayer, the burden is on respondent to establish all elements necessary to support this "new matter." Rule 142(a). Finally, if respondent raises sec. 482 so late as to violate principles of fair play and justice, the Court will refuse to consider the sec. 482 issue at all. *Achiro v. Commissioner, supra* at 891 and cases cited there.

Petitioner Penza contends that respondent should have the burden of proof as to his case, because the notice of deficiency sent to him did not mention sec. 482 as a ground for the determined deficiency, and respondent did not plead the issue until approximately 1 month before trial. See note 5, *supra.* Respondent counters that petitioner Penza knew and should

would have transpired between uncontrolled parties dealing at arm's length. *Powers v. Commissioner,* 724 F.2d 64, 66 (7th Cir. 1983), affg. a Memorandum Opinion of this Court; *Local Finance Corp. v. Commissioner,* 407 F.2d 629, 632 (7th Cir. 1969), affg. 48 T.C. 773 (1967), cert. denied 396 U.S. 956 (1969).

In cases where property owned by a taxpayer is leased to a controlled entity, section 1.482-2(c), Income Tax Regs., sets forth the standards that must be met in order to establish that the amount of rental charged is equal to that which would be charged in an arm's-length transaction. It provides in pertinent part:

SEC. 1.482-2(c) *Use of tangible property*—(1) *General rule.* Where possession, use, or occupancy of tangible property owned or leased by one member of a group of controlled entities (referred to in this paragraph as the owner) is transferred by lease or other arrangement to another member of such group (referred to in this paragraph as the user) without charge or at a charge which is not equal to an arm's length rental charge (as defined in subdivision (i) of subparagraph (2) of this paragraph), the district director may make appropriate allocations to properly reflect such arm's length charge. * * *

(2) *Arm's length charge.* (i) For the purposes of this paragraph, an arm's length rental charge shall be the amount of rent which was charged, or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances considering the period and location of the use, the owner's investment in the property or rent paid for the property, expenses of maintaining the property, the type of property involved, its condition, and all other relevant facts. If neither the owner nor the user was engaged in the trade or business of renting property, the arm's length rental charge for the taxable year shall be deemed to be equal to the amount specified in subdivision (ii) or (iii) of this subparagraph, whichever is appropriate,[8] unless the taxpayer establishes a more appropriate charge under the standards set forth in the first sentence of this subdivision. For purposes of this subdivision, an owner or user shall be considered to be in the trade or business of renting property if it engages in the trade or business of renting property of the same general type as the property in question to unrelated parties. An

have known that sec. 482 was the real issue because the adjustments to his returns were obviously derived from the formula rental allocation in the sec. 482 regulations, and because he had been advised of the nature of the computations long before the amended answer was filed.

We find it unnecessary to resolve this burden of proof dispute because, in our view, the result as to petitioner Penza will be the same irrespective of where the burden of proof lies.

[8]Subdivision (iii), relating to subleases, does not apply to this case because we are essentially ignoring the sublease between the corporation and the club and treating them as a single entity under common control with Medford Associates. See *supra* note 6.

owner or user will not be considered to be engaged in the trade or business of renting property of the same general type solely on the basis of casual or infrequent rentals of property which is predominantly used in its trade or business.

(ii) Except as otherwise provided in subdivision (iii) of this subparagraph the amount referred to in subdivision (i) of this subparagraph for the taxable year shall be equal to the sum of the following amounts attributable to the property:

(a) The amount which bears the same ratio to the depreciable basis of the property divided by the total useful life of the property in the hands of the owner as the number of days which the property is owned by the owner (in the taxable year) bears to 365. * * *

(b) The amount which bears the same ratio to 3 percent of the depreciable basis of the property * * * as the number of days which the property is owned by the owner (in the taxable year) bears to 365.

(c) The amount of all expenses directly and indirectly connected with the property paid or accrued by the owner of the property during the taxable year. Such expenses include real estate, personal property, or other taxes on the property, expenses of maintenance and repair, cost of utilities, management expenses, and other similar expenses. Such amount does not include interest expense.

(d) The amount of all expenses directly and indirectly connected with the possession, use, or occupancy of the property by the user paid or accrued by the owner during the taxable year. * * *

Respondent used the method in section 1.482-2(c)(2)(ii), Income Tax Regs., to compute the section 482 allocations. Use of that formula method depends, as a threshold matter, on whether Medford Associates, as the owner/lessor, and the corporation and the club, as the user/lessee, were "in the trade or business of renting property" within the meaning of the regulation. Accordingly, we first address this issue.

Under the regulation quoted above, Medford Associates is considered in the "trade or business of renting property" only if it engages in the trade or business of renting property of the same general type as the property in question, i.e., the golf course and related facilities, to unrelated parties. Sec. 1.482-2(c)(2)(i), third sentence, Income Tax Regs. As far as the record reveals, the only other rental that Medford Associates has ever made was of the frame dwelling and immediately surrounding land on the 5-acre parcel, but not the entire 5-acre parcel. This hardly qualifies as "property of the same general type" as the golf course. Thus, the formula rental charge of section 1.482-2(c)(2)(ii),

Income Tax Regs., as calculated by respondent, applies to Medford Associates and to petitioners unless they can establish a more appropriate charge under the standards set out in the first sentence of this subdivision, namely:

the amount of rent which was charged, or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances considering the period and location of the use, the owner's investment in the property or rent paid for the property, expenses of maintaining the property, the type of property involved, its condition, and all other relevant facts. * * * [Sec. 1.482-2(c)(2)(i), Income Tax Regs.]

This brings us back to the standard of an arm's-length transaction between unrelated parties, which is determined based upon all of the facts and circumstances of the case.[9]

As mentioned above, our determinations in section 482 cases are essentially and intensely factual. Thus, prior cases with materially distinguishable facts are of little assistance to us. However, both petitioners and respondent appear to labor under misconceptions as to these matters. Specifically, both attempt to divine in our case law certain per se rules which, they argue, essentially as a matter of law, dispose of the case without requiring extensive factual analysis on our part.

Petitioners cite *Pitchford's, Inc. v. Commissioner,* T.C. Memo. 1975-75, and *Johnson v. Commissioner,* T.C. Memo. 1982-517, affd. without published opinion 729 F.2d 1447 (3d Cir. 1984), for the proposition that no allocation of rental income to a lessor is ever appropriate under section 482 if the lessee "lacks available funds," after payment of operating expenses (other than rent), with which to pay the rent. Put another way, in petitioners' view, no allocation can be made if, for a given year, "payment of operating expenses to third parties exhaust[s] operating funds available for rent." Thus, according to this line of reasoning, because the parties have stipulated that the corporation, through operating expense payments to unrelated third parties during the years in issue, exhausted operating funds available to

---

[9]For purposes of this discussion, we ignore any possible different burdens of proof in this case. If petitioners Procacci, who must establish that respondent abused his discretion, i.e., that respondent's determination was "unreasonable, arbitrary or capricious" (*supra* note 7), prevail, then clearly petitioner Penza, as to whom respondent may have the burden to prove the appropriateness of his allocations, will likewise prevail.

pay rent to Medford Associates, the rule of law laid down by these cases prohibits any section 482 allocation.

We cannot agree with petitioners that these cases establish any such per se rule. Further, a fair reading of these Memorandum Opinions shows that we have not attempted to establish such a rule.

When properly analyzed, each case was decided not on the basis of the taxpayers' putative per se rule, but on its own peculiar facts. Thus, in *Pitchford's, Inc. v. Commissioner, supra,* we found, after an analysis of all the evidence, that there was not a reasonable expectancy that the controlled subsidiary could have paid interest to the taxpayer. Respondent had conceded in that case that absent such a reasonable expectancy,[10] his section 482 allocation would not apply. We accepted respondent's concession for the purposes of that case, but expressly declined to express any view on the question as to whether allocation of interest income under section 482 is precluded if there is no reasonable expectancy of collection of such interest. Instead we addressed only the factual issue. We based our finding upon an analysis of all the facts, including the subsidiary's weak balance sheet, its inability to generate ongoing income, and the subordination of the taxpayer's obligations to those of unrelated lenders.

Likewise, in *Johnson v. Commissioner, supra,* we found, again based upon its own facts, that the taxpayer had no reasonable expectancy of collecting interest from its subsidiary, a regulated water company. The water company operated at a loss and eventually went bankrupt; its gross receipts were less than the imputed interest; it had no source of funds other than its gross receipts and cash contributed by the taxpayer; the regulatory body could not by law grant rate increases sufficient to pay for more than current interest expense, so that the loans from the taxpayer were effectively "locked in" and became, in substance, capital contributions. We concluded:

---

[10]The "reasonable expectancy" doctrine relates to the accrual method of accounting, under which a taxpayer includes an income item in gross income when all the events have occurred which fix the right to receive the income and its amount can be determined with reasonable accuracy. Sec. 1.451-1(a), Income Tax Regs. However, if it is reasonably certain that the income will not be collected in the tax year or within a reasonable time thereafter, the taxpayer is justified in not accruing the item. *Corn Exchange Bank v. United States,* 37 F.2d 34 (2d Cir. 1930); *Chicago & North Western Railway Co. v. Commissioner,* 29 T.C. 989 (1958).

Consequently, we are convinced that petitioner's chances of recovering any of the advances themselves, much less any interest thereon, was, for all intent and purposes, non-existent. This being the case, petitioner had no reasonable expectancy of payment. * * * [44 T.C.M. 1076, 1084; 51 P-H Memo T.C. par. 82,517 at 2354.]

At best these cases merely apply a practical, facts and circumstances approach to the question of whether the amounts of interest income imputed under section 482 would have actually been paid in an arm's-length situation. That is the import of the "reasonable expectancy" exception to the general rule of accrual accounting. Finding that a taxpayer has no reasonable expectancy of receiving a payment means that the taxpayer would not have received the payment from an unrelated party in the same condition as the controlled one.

There are also logical flaws in petitioners' argument that application of section 482 is foreclosed by a scarcity of available operating funds. Businesses and individuals that do not have enough funds on hand to meet current expenses, particularly new businesses in their early years, often borrow to do so. Thus, the fact that operating funds are insufficient to pay expenses does not necessarily mean that those expenses would not have been paid in an arm's-length situation—the possibility of the obligor borrowing the funds from a third party must be considered. *Powers v. Commissioner, supra,* 724 F.2d at 66. However, although not dispositive, a lack of operating funds is *relevant* in determining whether an uncontrolled obligor would have paid the expenses in question. It is one of the facts and circumstances to be taken into account.

Respondent also contends for a rule of black-letter law. He cites *Thomas v. Commissioner,* T.C. Memo. 1983-462, 46 T.C.M. 974, 52 P-H Memo T.C. par. 83,462, for the proposition that whenever the controlled obligor's gross income exceeds the amount imputed under section 482, respondent's allocation must be upheld, no matter what other expenses the obligor has. However, we do not read the case as establishing any such per se rule. The parties in that case had stipulated that the rent allocated by respondent was the fair market rental value of the property. We upheld the rental allocations in that case because:

it is clear * * * that petitioners would not have allowed an outside unrelated party the use of their property to carry on a business enterprise, in return for nothing more than the payment of insurance and real estate taxes * * * . This record indicates that John was a versatile, knowledgeable, and energetic businessman, and we do not think he would have entered into this arrangement, dealing at arm's length with an uncontrolled and independent entity. If his "lessees" could not have paid the rent, he would not have rented the property to them. [46 T.C.M. at 979; 52 P-H Memo T.C. at 1901.]

The taxpayer in that case argued that the allocation should not be upheld because the controlled lessees were insolvent and could not afford to pay rent. On the facts, however, we found that the lessees were not unable to pay the rent because their gross incomes were in excess of the stipulated fair market rental (arm's-length rental) value. Thus, a section 482 allocation was not foreclosed because of inability to pay:

We are accordingly not faced here with the type of situation where it appeared that the imputed "payor" simply did not have enough money from *any* source to pay the gross income reallocated by respondent, see *Pitchford's, Inc. v. Commissioner* * * * ; *Johnson v. Commissioner* * * * . We do not have the situation where respondent appears to be "creating income," where no gross income exists to satisfy such an allocation. * * * [46 T.C.M. at 979; 52 P-H Memo T.C. at 1902. Emphasis in original text.]

Thus, the holding of *Thomas* is that a section 482 allocation is not *prohibited* because of net losses on the part of the lessees, if the lessees have gross income equal to or greater than the allocation; it does *not* hold that the allocation is per se proper given sufficient gross income. In that case the lessees paid no rents and the stipulated fair market rental values, which were the basis for respondent's imputed rents, were *quite* substantial in amount. We agree with the holding of *Thomas* that a lack of net income does not preclude application of section 482. Even a lack of sufficient gross income would not necessarily preclude application of section 482. As discussed above, an unrelated lessee with insufficient funds on hand, particularly a new business in its early years, whether due to the payment of other operating expenses or to a lack of sufficient gross income, might borrow enough to pay the rent. Also, quite significantly,

there is no agreement or stipulation as to fair market rental value in the present case.

Respondent's proposed per se rule, aside from finding no basis in our case law, also suffers from logical flaws. Thus, even if an unrelated lessee had gross income in excess of the allocation, he and the lessor may nevertheless have agreed to a reduction in, or cancellation of, rent for a number of reasons. For example, the lessee may be operating the property at a loss and threaten to abandon the lease, and there may not be any other person willing to lease the property. In such a situation, the landlord might well agree to lower or even cancel the rent in order not to be forced to take over the property and incur the losses itself. Or, the lessee might simply default on its rent payments but continue operating the property during a period of informal negotiation or legal maneuvering with the landlord. In such a situation, an unrelated landlord would certainly not be charged with rental income that it did not collect from the unrelated tenant and, if the related parties' situation is the same in all material aspects, neither should the related landlord.

Of course, as was the case with petitioners' proffered per se rule, the fact that the lessee has gross income in excess of the allocation is *relevant*, but not dispositive, in determining whether an uncontrolled lessee would have paid the imputed amounts of rent. The taxpayer usually argues that the path he would have followed had the transactions in issue been at arm's length would have produced the same consequences as the one he did follow. Usually, the claim is made that he would have followed the same path in an arm's-length situation as was followed in the controlled situation. However, a taxpayer is free to argue and prove that he would have followed a different path having the same consequences, or different consequences but in the opposite direction of respondent's allocations. Thus, a related lessor who received no rent from his controlled lessee might argue that, had they been at arm's length, the lessee still would have paid no rent. Or, the lessor could argue that not only would the lessee have paid no rent, it would have demanded (and received) operating subsidies from the lessor, such that the latter's taxable income would

have been *less* in the arm's-length situation than it was in the controlled situation.

Thus, section 482 requires that we trace a hypothetical arm's-length path, using as parameters the facts and circumstances of the particular case as shown by the record and determine its consequences. And, because the determination is so fact-specific, prior cases with materially different facts are of limited guidance to us. In other words, in a case like this, there are no per se rules or bright-line tests. In the instant case, therefore, our task is to determine the amount of rent that would have been paid to Medford Associates had its lessee been an unrelated party dealing at arm's length.

Both parties presented expert reports and testimony of their experts on the subject of the fair market rental value of the golf course during the years in issue. Fair rental value is certainly relevant, and is one of the important facts to be taken into account in making our determination.

Expert testimony can often assist the Court in determining facts in issue and, in such cases, may be admitted into evidence. Fed. R. Evid. 702. Our rules require that a party wishing to call an expert witness to testify shall have the expert prepare a written report for submission to the Court and the opposing party. The report, if offered, becomes part of the expert's direct testimony if the Court finds that he qualifies as an expert. Rule 143(f). We are not bound by the opinions of experts, *Estate of Kreis v. Commissioner,* 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court, and may either embrace or reject expert testimony as we deem appropriate. *Helvering v. National Grocery Co.,* 304 U.S. 282 (1938). We need not accept an expert's opinion in its entirety and may be selective in the use of any portion of it. *Parker v. Commissioner,* 86 T.C. 547, 562 (1986).

Petitioners offered as their expert Cecil R. McKay, Jr., a principal in the firm of McKay Golf & Country Club Properties located in Lansing, Michigan. The firm was founded in 1941 and has specialized exclusively in golf and country club transactions since 1964. McKay has personally been involved in appraisals of over 300 golf courses and in sales of over 200 golf courses. He has been involved in

dozens of golf course leases. McKay's appraisal clients include the Internal Revenue Service and the U.S. Department of Interior. The Internal Revenue Service hired McKay's firm to appraise a golf course in a dispute as to its value, and McKay's appraisal was used to successfully settle the matter. The Department of Interior owns several golf courses in the District of Columbia that it leases to private entrepreneurs for operation. McKay was hired to determine the lease value of the golf courses and the amount of rent the Department of Interior should charge the lessees. He co-authored a book for the American Institute of Real Estate Appraisers entitled Golf Courses: A Guide to Analysis and Valuation (American Institute of Real Estate Appraisers 1980).

Petitioners hired McKay to determine the fair market rental value of the Medford Village Golf & Country Club as of the years 1976, 1978, and 1979. McKay prepared a report and testified at the trial.

According to McKay, there are three basic methods of valuing property, and each has its analog in determining the fair rental value of the property.

### a. *Cost of Reproduction/Return on Assets Approach*

Under this approach, the value of improved real estate is determined as the cost of acquiring the raw land and reproducing the improvements, with a downward adjustment to the cost of the improvements for obsolescence and depreciation. Fair rental value is then determined as the amount of rent necessary to provide the owner with a return on the property equal to a certain percentage of the real estate value. This is the approach taken by section 1.482-2(c)(2)(ii), Income Tax Regs., and thus the one that respondent utilized in making the rental allocations.

According to McKay, there are serious drawbacks to this approach that make it inappropriate in estimating the fair market rental value of a golf course. First, golf courses are costly assets, the operation of which cannot normally generate the level of income other assets can. Many courses are constructed for reasons other than deriving a return on investment. Thus, in the past, many golf courses were built by nonprofit clubs for recreational rather than business

purposes. At present, many courses are built as part of larger real estate development projects for the purpose of increasing the marketability and value of the surrounding properties, e.g., homes and office buildings. The developer may lease the golf course to a third party or otherwise operate it so that he receives little or no return. Not infrequently, such golf courses are leased or sold to an operator for nominal or no consideration. While receiving no return from the sale, lease, or operation of the golf course itself, the developer does receive a return from the sale or lease of the surrounding property at values substantially in excess of those that could have been obtained absent the course.

Second, this cost-of-reproduction/return-on-assets approach is based on the valuation of assets in which the lessee has no interest. The lessee's profit is derived solely from operating revenues. In the golf course business, there is a high degree of expense in relation to income, and the operator has only the net revenues from which to make lease payments and derive any profit.

Third, there is usually an alternate use of the land, for example, commercial or residential development. However, it would be inappropriate to use the cost of acquiring the land for development purposes to value the golf course because the two activities cannot coexist on the same parcel of land at the same time.

Finally, it is not always easy to determine what would actually be replaced. There are extreme variations in the reproduction costs of golf holes depending on the size and quality of the greens, tees, fairways, and irrigation systems.

### b. *Market Comparison Approach*

Under this approach, the value of land is ascertained by reference to sales of comparable land near in time to the valuation date. This is a common and well-accepted method of valuing real property.[11] The analogous approach in determining fair market rental value is to consider rents paid under leases of similar properties. There are problems with the method which make its use inappropriate in estimating the fair market rental value of a golf course,

---

[11]E.g., *Jacobson v. Commissioner*, T.C. Memo. 1989-606.

however. First, it is not common for golf courses to be leased, so that few comparisons are available. The testimony of respondent's own expert bears this out. Second, it is difficult to determine whether another lease is truly comparable because, in addition to the land, improvements, and equipment that would be considered in a sale, the lease terms must also be taken into account. Different leases may allocate expenses of the property between lessor and lessee differently, or one lease may grant the lessee an option to purchase the golf course whereas another may not.

### c. *Income or Cash-Flow Approach*

Under this approach, value is determined by estimating the future cash-income flows to be produced by the property and then discounting them to present value. Similarly, in determining fair market rental value, the cash-flow profit which the golf course is likely to generate is estimated, and is divided between the lessor and lessee as rent and operating profit, respectively.

Factors considered in arriving at projected cash-flow profit include:

1. The best method of operating the course. There are three ways to do this:

a. The course can be operated on a daily-fee-for-profit-basis, under which players are charged a set fee to play a round of golf. In calculating cash-flow profit, the main consideration is the number of players who will pay to use the course and the fee revenue they will generate;

b. The golf course can be operated as a private club. The consideration here would be the number of members who can be found and the amount they are willing to pay for dues, initiation fees, and stock.

c. The golf course can be operated as an amenity for a development, resort, or municipality. The important factor is the value that the golf course adds to the operation with which it is associated, e.g., how much does it increase the selling price of homes in the area to the developer? A golf course used for intense daily-fee play requires different considerations than one which is part of a private club. The finer private golf courses, such as Firestone, Colonial, and Augusta National, could not exist as public, daily-fee

courses due to their level of difficulty and maintenance costs;

2. The physical layout of the course;

3. The population and number of other courses in the surrounding area. For example, a championship course in a nonpopulous area may have a value lower than its reproduction cost. The National Golf Association guideline is one 18-hole course for each 20,000 to 25,000 of population; if there is one golf course for each 10,000, the course would have half the potential income as one within the guideline; and

4. The length of the golfing season.

Using these four factors, the revenue that the golf course can generate, and the expenses required to produce it, are projected. The expenses are then subtracted from the revenues and the result is the projected cash-flow profit, which is the amount available to buy or lease the course.

According to McKay, this income approach is the only proper method to use in negotiating a lease, or determining the fair market rental value, of a golf course. In his more than 20 years of experience with golf course sales and leases, McKay has not encountered or learned of a golf course lease under which the rent was determined by reference to the replacement cost of the leased assets. Rather, in all cases with which he is familiar, rent is based upon the income-generating potential of the course. In his opinion, it is never correct to determine the rental value of a golf course on a return-on-assets basis.

There are several reasons for this. First, as mentioned above, the return-on-assets approach entails the value of land and other assets in which the lessee does not participate. Second, any prudent businessperson contemplating leasing a business must take into account income produced and expenses incurred, since his or her profit must come solely from operating net income. In particular, in the golf course business, as mentioned above, there is a high degree of expense in relation to revenue. Third, the lessor's first priority is proper maintenance of the golf course so that it

does not deteriorate. Poor maintenance reduces the level of play, and thus in turn decreases the lessee's ability to maintain the course. If the rent is set too high, something will suffer, and it is usually maintenance. The result is that the golf course not only goes downhill but the lessor loses the lease payments as well. The lessor wants a strong guarantee that the lessee will overcome disasters and maintain the golf course properly, and the main reason that leases are not consummated is the lessor's fear that the prospective lessee will not be able to do so. Beyond insuring proper maintenance, the lessor also wants to avoid liability for operating losses. From the lessor's point of view, receiving some amount of rent is better than none, or taking the course back after the lessee defaults and operating it at a loss.

McKay is aware of situations in which projected revenues have not been realized. For example, in the District of Columbia, a lessee simply abandoned a course and "let it grow up." A lessee allowed another course to "run down tremendously" in order to balance costs against income. There are many other disaster stories of golf courses sliding downhill due to poor maintenance, some eventually ending in bankruptcy. In McKay's experience, it is not unusual for the lessor to reduce or forgive the rent in these situations in order to keep the golf course properly maintained and to avoid incurring operating losses. On the other hand, McKay has witnessed lessees forgoing profit to pay rent after covering other operating expenses.

Thus, according to McKay, the income approach takes into account the objectives of both the lessor and lessee.

McKay determined the fair market rental value in this case using the income approach. McKay and his associates have developed an extensive data bank of the results of financial operations of golf courses all over the United States. Using this information, they can determine whether the income and expenses of a golf course are within normal limits, given the four factors set forth above, and predict future cash-flow profit. This was the approach taken in estimating the fair rental value of the golf course, as detailed below.

McKay's analysis began with the combined financial statements of the corporation and club[12] for 1975 because, in his opinion, 1975 results would be used in determining rental value for 1976. He made certain modifications, however, the most important of which was the elimination of the following expenses because, in his opinion, they would not have been borne by an unrelated lessee:

| | |
|---|---:|
| Taxes & licenses | $24,696 |
| Depreciation | 8,958 |
| Interest & service charges | 1,740 |
| Total | 35,394 |

After the modifications, the actual cash-flow profit of the golf course for 1975, according to McKay, was $29,922.[13] (Column 1.)

Using his data base and computer, McKay then generated predicted expenses based upon (i.e., as a function of) actual revenues. The computer-generated expenses of $328,797, as opposed to actual expenses of $336,558 (after the modifications), and a cash-flow profit of $38,998 indicated that the golf course was reasonably well-managed, i.e., that its cash-flow profit was not artificially reduced by excessive expenses. (Column 2.)

McKay then computer-generated both predicted revenues *and* expenses based upon the various parameters (the four factors) set forth above in the discussion of the income method. He arrived at an estimate of $81,351 of potential cash-flow profit. (Column 3.)

Computer-generated projections of golf course potential develop the maximum revenue that the golf course could produce assuming excellent management and ideal conditions. Few, if any, golf courses would ever exceed the projected potentials, and most golf courses do not reach them. Thus, the $81,351 figure is the maximum cash-flow profit that the golf course in this case could attain. In McKay's opinion, this potential was unlikely to have been obtained in 1976 because the golf course was still recovering

---

[12]See note 6, *supra*, for a full explanation of why we adopted McKay's approach and also combined these entities for purposes of our analysis.

[13]The net loss for 1975 shown on the combined financial statement of the corporation and club is ($5,272). Adding back to this amount the above expense items produces a figure of $30,122, $200 more than the cash-flow profit that McKay arrived at. We are not able to explain this $200 discrepancy, but we regard it as de minimis.

from bankruptcy, which normally requires 8 to 9 years. So in columns 4 and 5 McKay projected this $81,351 figure into the future, increasing it for annual business increases and inflation at rates of 10 percent and 7 percent, respectively. In McKay's opinion, the golf course's fair rental value for 1976 would not exceed $30,000.

McKay used a somewhat different approach, in part, in estimating fair rental value for 1978 and 1979. He began with the actual results for 1977 (as adjusted for the expenses listed above), as he had done before. (Column 1.) He then projected expenses based upon actual revenues, as he had done before. (Column 2.) However, instead of generating computer-projected revenues and expenses for 1977 (Column 3), as he had done earlier, he carried over future-year projections from prior-year estimates. Since the earlier Column 3 ($81,351) represented the maximum potential cash-flow profit for this golf course, he began with that figure, adjusted for business increases and inflation. In other words, instead of a computer-generated figure for Column 3, he used Column 5 from the earlier report.

Thus, in arriving at the estimate for 1978, he began with adjusted 1977 results (Column 1), then generated predicted expenses based upon actual 1977 revenues (Column 2). However, Column 3 was not a computer generation of both revenues and expenses but was the earlier Column 3 adjusted for inflation and annual business increases, i.e., the earlier Column 5. Then Columns 4 and 5 further projected the effects of inflation and business expense by applying assumed annual business increases and inflation rates of 10 percent and 7 percent, respectively, to Column 3 of the 1977 estimate. For the 1979 estimate, Column 1 begins with the actual income and expenses for 1978. The second column is actual income for 1978 with computer-generated expenses. In the third column, the business increase and inflation rates are applied to Column 3 of the 1978 estimate. Again in Columns 4 and 5 the effects of inflation and business increases are further projected. McKay chose to use the future-year projections because a computer generation of revenues and expenses for 1978 and 1979, based on the same four factors as before, would have produced exactly the same numbers as it did for 1976.

The adjusted actual cash-flow profit, and cash-flow profit using actual revenues and computer-generated expenses, for the 1978 and 1979 estimates, as determined by McKay, are presented below:

|  | 1978 | 1979 |
|---|---|---|
| Adjusted actual cash-flow profit for prior year (1977 and 1978, respectively) | $21,597 | ($22,857) |
| Cash-flow profit based on actual prior-year revenues (again 1977 and 1978, respectively) and computer-generated expenses | 35,231 | 41,907 |

In other words, the actual cash-flow profit for 1977, which was used to determine rental value for 1978, was $21,597, and the computer (based on actual income and computer-generated expenses) predicted income of $35,231 for 1978. In fact the actual cash-flow for 1978 was a loss of $22,857. In other words, in these instances while the computer-projected earning potential shows increases, these potential increases have not been attained. Because he felt that the financial results for these years did not show significant improvement over those for earlier ones, McKay concluded that the maximum fair rental value of the golf course in 1978 and 1979 was also $30,000.

Respondent also presented the expert report and testimony of his expert, Robert A. MacPherson. MacPherson received a bachelor's degree in social sciences from Rutgers University. Since 1965, he has appraised real estate of all types. From 1965 to 1969, he was a senior right-of-way negotiator for the New Jersey Department of Transportation (NJDOT), responsible for the valuation of real estate for highway and environmental acquisition purposes. From 1969 to 1972, he was a principal right-of-way negotiator for the NJDOT, responsible for quality review and determination of appraisal estimates. Since 1972, he has been a real estate appraiser for the Internal Revenue Service, responsible for reviewing appraisal estimates submitted by taxpayers, and preparing value estimates of all types of real property.

Prior to preparing his valuation for this case, MacPherson had never estimated the fair market rental value of a golf

course. He had allocated the value of a golf course between land and improvements, and had performed partial valuations of golf courses for eminent domain purposes.

In arriving at his estimate of fair rental value, MacPherson first estimated the fair market value of the golf course as of December 31, 1976. He based his estimate on sales of golf courses in southern New Jersey in 1974, 1980, and 1981, and arrived at a figure of $80,000 per hole, or $1,440,000. He then assumed a lease term of 10 years from December 31, 1976, a "capitalization rate" of 8.5 percent, comprised of 6.5 percent average prime rate for 1976 plus a "risk factor" of 2 percent, that the golf course (both land and improvements) would appreciate in value by 50 percent, to $2,160,000, over the assumed term of the lease, and that, by the end of the lease term, the land value would have increased to the point that it would no longer be used as a golf course, but for residential or commercial development. There is no support in the record for any of these various assumptions.

It was MacPherson's opinion, however, that the golf course could not be economically developed until that time. He then discounted this amount to December 31, 1976, using the capitalization rate, arriving at a figure of $1,204,664.40, which he called the "present worth of development potential." He then subtracted the latter amount from the $2,160,000 estimated future value. He characterized the difference, $955,335.60, as the present value of the amount which a lessor would want to obtain from a lessee over the lease term. He then calculated the annual payment that would be required to amortize this amount over the term of the lease, again using the "capitalization rate." Mechanically, he used the 8.5-percent capitalization rate, went to the Inwood Factor Chart to get a factor of 81.225745, divided the $955,335.60 by that factor to arrive at a monthly rent of $11,761.49 or $141,137.84 annually. Put another way, he calculated the amount of each of ten equal payments, made annually beginning December 31, 1976, the present value of which, when discounted at 8.5 percent, was $955,335.60. The amount of rent as he calculated it was $141,137.84 per year. He set the

$141,137.84 as the fair rental value, plus or minus 5 percent for negotiation purposes.

In making his estimate of rental value, MacPherson did not take into account the corporation and club's operating results, nor the fact that the land was, and would continue to be, used as a golf course. Nor did he take into account the rent that a lessee would be willing to pay to lease the golf course.

We think that McKay's approach is the correct one to use in deciding the factual issue before us. Respondent attempts to use some leases of other golf courses in different parts of the country to contradict McKay's contention that the income approach is the proper method to use in negotiating golf course leases, and to support the reasonableness of MacPherson's conclusion. The leases were actually offered by petitioners to buttress McKay's testimony. We accord these leases little probative weight, however, because they relate to different golf courses, in different geographical areas, cover different time periods, and have different provisions from the leases in issue. Several of the leases contain options to purchase, which casts them in a wholly different light from the situation in this case. A lessee with an option to purchase the golf course does not necessarily receive its profit solely from the course's operation, but has an interest in future appreciation of the realty as well. Here the corporation and club were given no such option.

In a further attempt to discredit McKay's opinion that the income approach is proper, respondent points to page 76 of McKay's book, which contains a description of a golf course in southeastern Florida. According to the description, the restaurant and lounge are leased at 7.5 percent, and the pro shop and driving range at 20 percent, of sales, plus certain prorated expenses. Respondent also draws our attention to a golf course lease, which petitioners introduced, under which the rents are partially determined by reference to course revenues. Respondent claims that these prove that rentals are determined other than on the basis of potential cash-flow profit. We do not agree. First of all, the description does not relate to the lease of an entire course, only certain operations. Second, and more importantly, the fact that the rentals are expressed in part as percentages of

revenue does not mean that the lessees did not consider potential profits in entering into the leases; to the contrary, that the rentals are largely tied to amounts which directly determine net income (revenue) tends to show that they did. Thus, stating the rentals in this manner is not inconsistent with the use of the income approach.

We found McKay to be a very knowledgeable expert witness with impressive experience in the leasing of golf courses. We accept his testimony that the income approach is the proper one when negotiating such a lease, and in estimating the amount of rent a hypothetical lessee would pay for a golf course. Further, "the wearing of judicial robes does not require that we take leave of commonsense," *Freytag v. Commissioner,* 89 T.C. 849, 878 (1987), and common sense dictates that no unrelated, knowledgeable lessee will agree to pay rent in excess of the net income which the leased premises can reasonably be expected to generate. The fair market value of, or the lessor's investment in, the property is of no consequence to the lessee— only the net income that it can produce. As McKay indicated, the income method takes into account the interests of both the owner/lessor and the user/lessee.

By contrast, MacPherson's valuation, which respondent offered to buttress its formula rental allocation, is without any factual basis and constitutes virtually a journey to fantasyland.[14] While there are numerous flaws in his analysis, the most glaring is the fact that he did not take into account that the real estate in question was used as a golf course, or the financial results of its operation. The following passage from the transcript is particularly revealing:

Q Now, Mr. MacPherson, * * * after paying expenses of operating the golf course there is no money available in 1975.

I want you to assume the correctness of that. Is it your contention that that lessee in 1976 would agree to pay a rent of $147,000?

A It is my contention that the lessor in order to return his investment or his value should command that type of rental. *Whether the lessee agrees or not has no bearing on it.* [Emphasis supplied.]

---

[14]MacPherson disregarded what the partners actually paid for the property ($1.1 million for the golf parcel, 5-acre parcel, and the 100-acre parcel), came up with a value of $1.4 million for just the golf course based on an arbitrary $80,000 per hole figure, and a wholly unsupported assumption that the partners had obtained a bargain sale of the property. The rest of his assumptions also lack any support in the record, and the balance of his "valuation" is a mere mathematical exercise.

Q Can I ask you how a lessor/owner who wants to retain his property as a golf course can lease the property if there is no willing lessee out there?

A I don't know how he could do it but that would tend to indicate that the highest and best use would not be for a golf course.

Q So you would tell this particular landowner that he ought to change the use of his property?

A Yes I would.

Q And if he doesn't you would attribute rent to him as if he had?

A I attribute rent based on not the feelings of the person who owns the property so much as what is the highest and best use of the property and what is the highest income potential to the property.

Q Did you consider in your valuation the market place of golf course rentals—rentals of golf courses?

A I could not discern any so-called marketplace of golf course rentals that was available for me to investigate.

Q Are you aware that in 1975 the payments of operating expenses for this golf course so that they could run the course to keep it operating exhausted the available funds?

Were you aware of that?

A No I was not aware of that.

Thus, MacPherson's analysis is based solely upon what a lessor *would want to* receive in rent for the land in an abstract "highest and best use," regardless of what a lessee would be willing to pay. However, we are seeking to determine what rent the lessor *could* receive from an unrelated lessee, pursuant to arm's-length bargaining, for *this* golf course in *this* condition with *this* operating history. MacPherson completely disregarded all of the facts and circumstances in regard to this particular golf course. He essentially assumed that the fair rental value was the amount of rent which the lessor would "demand," which in turn was the "capitalization rate" multipled by the fair market value of the land.

However, what is relevant in the section 482 context is not what a lessor would demand, but what he could reasonably get in arm's-length bargaining with an unrelated lessee. There is no law of economics that mandates that a lessor will always receive rent equal to a market rate of return on the value of his leased property. In fact, McKay testified that "golf courses and their associated equipment are costly assets, the operation of which normally cannot generate the level of income which could be produced by other types of assets of similar value." Also, MacPherson

was unable to indicate what the "highest and best use" of the land was during the relevant time period. He admitted that it was not suitable for development, and could not point to any other use higher or better than the existing one, i.e., a golf course.[15] In short, MacPherson's analysis is directed to neither the facts, nor the issue in this case. In sum, it provides no basis at all for the allocation of rental income from the corporation and club to Medford Associates.

However, we do note some flaws in McKay's analysis. First, in determining available cash-flow, he eliminated certain items totaling $35,394, detailed above. However, the corporation and club in fact incurred these expenses in operating the golf course, and there is no suggestion that these expenses were excessive or unnecessary.[16] They must either be factored back into the determination of the cash-flow profit that the corporation and club could have been expected to generate, or, what is essentially the same thing, allocated to Medford Associates. In either case, they offset the amount of rent properly allocable to the latter. Second, and more importantly, in determining the expected cash-flow profit and rent for a given year, McKay focused exclusively on the results from the prior year. We agree that these are certainly relevant, but cannot agree that they are exclusively so. The lease was entered into in 1971, and we believe that any knowledgeable lessee would have considered the entire operating history of the course, particularly its large losses, bankruptcy, and rundown condition from the Sunny Jim days. McKay in fact testified that a golf course that has failed normally requires 8 to 9 years to recover economic health. Thus, we will take all of these factors into account in making our determination.

[15]Respondent introduced into the record a document entitled "The Appraisal of Lease Interests," which is chapter 25 of a book by the American Institute of Real Estate Appraisers, The Appraisal of Real Estate. Although respondent apparently seeks to use this document to bolster MacPherson's testimony, we note that:

1. MacPherson did not consult either the chapter or the book in connection with the formulation of his report, and
2. The chapter relates to the valuation of various interests, but it does not discuss golf course valuations, let alone the determination of the fair market rental value of golf courses.

The document is thus of little help in this case.

[16]The depreciation item is of course a noncash expenditure but is a factor in the financial operation of the business. Moreover, the corporation and club did replace some of the depreciable assets such as golf carts and cart batteries.

We conclude that petitioners have "establishe[d] a more appropriate charge" than the one determined by respondent, and that charge is zero. The golf course had hemorrhaged money and created mounting losses (it lost $234,110.05 in the year ending May 31, 1969), ended up in bankruptcy, and physically deteriorated to "cow pasture" status. Any reasonably knowledgeable lessee would have realized that operating the golf course would have entailed substantial losses for a number of years, especially in view of the fact that the Medford Associates partners wanted not only to restore the course to financial health, but to build it up to championship status. We do not think that any such lessee would have agreed to pay any rent until after it had recouped its losses, i.e., well after the course had been restored to profit-making status, which would not have been expected to occur for at least 8 to 9 years from 1971, when operation of the course recommenced following bankruptcy. In fact, in our view, it is quite possible that such a lessee would have demanded operating subsidies from the partnership in view of the inevitable losses.

The operating history of the course subsequent to 1971 certainly bears out such a judgment. Cumulative cash-flow losses to the corporation and club through 1979 exceeded $100,000 when their expenditures on golf carts and golf cart batteries are taken into account. Further, as the parties have stipulated, operating expenses paid to unrelated third parties exhausted operating funds available for rent, something that an informed unrelated lessee would have foreseen. Even if an unrelated lessee had agreed to pay rent, we think that long before 1976 it would have demanded and been granted forgiveness of the rent as a condition of continuing to operate and maintain the golf course. That, according to McKay, would not have been unusual in this industry. Medford Associates would still have received no rent.

The lessee's continuing to operate the golf course even without payment of any rent would still have been beneficial to Medford Associates, as it would have insulated it from losses from operation. The record shows that in fact from 1971 to 1979 the partnership had to funnel $130,326 in "advances" to the corporation and club to keep the course

operating and improving, which perhaps would not have been required in the case of an unrelated lessee paying no rent. Moreover, a zero-rent situation would not have been unusual in the golf course industry. According to McKay, very often developers lease golf courses that are part of residential and/or commercial developments for little or no consideration because of the value the course adds to the surrounding real property. The Medford Associates partners fit this situation, because they purchased not only the Sunny Jim golf course but nearby land as well, and contemplated developing both. They in fact began to seek rezoning of the 100-acre parcel immediately after they acquired it, and sold that land at a substantial profit in 1978. And, since this sale, the partnership has been seeking approval to build condominium townhouse units on part of the golf course, on the practice driving range. Thus, Medford Associates, in an arm's-length situation, would have been more than happy to have leased the course at zero rent to a lessee who would have not only operated it, but improved it to championship caliber.

Our conclusion is also consistent with McKay's expert opinion. Although he concluded that an independent operator would have been willing to pay $30,000 in rent, he based that conclusion in part on an assumption that the operator would not have borne $35,394 in certain expenses. However, the corporation and club in fact did incur and pay those expenses. The latter sum for the expenses virtually offsets the rent; viewed another way, McKay would have allocated $30,000 in rental income, and $35,394 in expenses, to Medford Associates. Either way, based upon McKay's testimony, Medford Associates' net income would not have increased. Instead Medford Associates' loss would have been larger.

Respondent, however, contends that petitioners "admitted" in the lease that the golf course's fair rental value was more than $60,000 a year. We view it as rather ironic that respondent attempts to use a lease entered into between controlled parties to show what would have occurred between uncontrolled ones. As stated above, we do not think that an uncontrolled lessee would have agreed to pay, or would have in fact paid, any rent during the years in

issue. In the same vein is respondent's argument that, because Medford Associates in fact controlled the corporation and club, it was the dominant party and could have forced them to pay any amount of rent. This argument seems to be the proverbial attempt to get blood out of a turnip and misperceives the nature of a section 482 analysis, which requires that we assume the parties are unrelated, i.e., that no control relationship exists. And, in an uncontrolled situation, the prospective lessee would have clearly had the dominant negotiating position—the land was not suitable for development and could not be developed at that time, so that there would have been no economically feasible alternative use. The golf course had been bankrupt, had a history of losses, was in poor physical condition, and the Medford Associates partners wanted it built up to championship status. We are satisfied that no unrelated lessee could have been found who would have agreed to undertake such a project without substantial operating subsidies or other guarantees against loss.

For all of the foregoing reasons, we conclude that there was no factual basis for respondent's allocations for the years before the Court, and that no section 482 adjustment was warranted. Respondent's allocations were unreasonable, arbitrary, and capricious. No amount of rent should have been allocated from the corporation and club to Medford Associates, and respondent abused his discretion in making such allocations in this case.

To reflect the foregoing,

*Decisions will be entered for the petitioners.*

---

## APPENDIX

The financial statements and Federal income tax returns of the Medford Associates partnership and of the corporation and club reflect the following information:

| *Medford Associates partnership* (1) | *1971* | *1972* | *1973* |
|---|---|---|---|
| Rental income (2) | - - - | - - - | - - - |
| Gain from sale of 100-acre parcel (3) | - - - | - - - | - - - |
| Gain from sale of vehicle | - - - | - - - | - - - |
| Interest income | - - - | - - - · | - - - |
| Total income | - - - | - - - | - - - |

| Medford Associates partnership (1) | 1971 | 1972 | 1973 |
|---|---|---|---|
| Rental expenses | - - - | - - - | - - - |
| Depreciation | $80,222.00 | $80,075.00 | $69,244.00 |
| Interest | 182,742.00 | 78,266.00 | 73,511.00 |
| Real estate taxes | 148,826.00 | 40,257.00 | 54,099.00 |
| Professional fees | 27,214.00 | 16,395.00 | 5,538.00 |
| Other expenses | 8,777.00 | - - - | - - - |
| Total expenses | 447,781.00 | 214,993.00 | 202,392.00 |
| Net income (loss) | (447,781.00) | (214,993.00) | (202,392.00) |
| Cash-flow from operations (4) | (356,307.00) | (130,093.00) | (139,139.00) |
| Advances made to corporation and club (5) | 22,293.00 | (22,293.00) | (7,930.00) |
| | | | |
| Corporation & club (6) | (7) | | |
| Sales | 193,019.91 | 143,509.00 | 198,631.00 |
| Cost of goods sold | 139,861.35 | 69,347.00 | 99,492.00 |
| Gross profits | 53,158.56 | 74,162.00 | 99,139.00 |
| Other revenues (dues, green fees, etc.) | - - - | 193,699.00 | 215,433.00 |
| Total income | 53,158.56 | 267,861.00 | 314,572.00 |
| Operating expenses | 56,644.31 | 289,499.00 | 336,318.00 |
| Net income (loss) | (3,485.75) | (21,638.00) | (21,746.00) |
| Cash-flow from operations (4) | (8) | (8) | (57,366.00) |
| Cash expended for replacement of golf carts and golf cart batteries | - - - | - - - | 5,343.00 |
| Cash-flow after replacing cars and batteries | - - - | - - - | (62,709.00) |

| Medford Associates partnership (1) | 1974 | 1975 | 1976 |
|---|---|---|---|
| Rental income (2) | - - - | - - - | - - - |
| Gain from sale of 100-acre parcel (3) | - - - | - - - | - - - |
| Gain from sale of vehicle | - - - | - - - | - - - |
| Interest income | - - - | - - - | - - - |
| Total income | - - - | - - - | - - - |
| Rental expenses | - - - | - - - | - - - |
| Depreciation | $66,409 | $57,007 | $68,017 |
| Interest | 78,546 | 63,755 | 64,205 |
| Real estate taxes | 48,863 | 38,316 | 54,491 |
| Professional fees | 9,363 | - - - | - - - |
| Total expenses | 203,181 | 159,078 | 186,713 |
| Net income (loss) | (203,181) | (159,078) | (186,713) |
| Cash-flow from operations (4) | (136,812) | (101,539) | (118,239) |
| Advances made to corporation and club (5) | (65,622) | 49,846 | 59,620 |
| | | | |
| Corporation & club (6) | | | |
| Sales | 214,381 | 197,669 | 253,938 |
| Cost of goods sold | 95,490 | 92,514 | 128,153 |
| Gross profits | 118,891 | 105,155 | 125,785 |
| Other revenues (dues, green fees, etc.) | 255,563 | 261,325 | 239,505 |
| Total income | 374,454 | 366,480 | 365,290 |
| Operating expenses | 328,028 | 371,752 | 383,159 |
| Net income (loss) | 46,426 | (5,272) | (17,869) |
| Cash-flow from operations (4) | 59,613 | 19,946 | (36,724) |

| Corporation & club (6) | 1971 | 1972 | 1973 |
|---|---|---|---|
| Cash expended for replacement of golf carts and golf cart batteries | - - - | $8,688 | $6,182 |
| Cash-flow after replacing carts and batteries | $59,613 | 11,258 | (42,906) |

| Medford Associates partnership (1) | 1977 | 1978 | 1979 |
|---|---|---|---|
| Rental income (2) | - - - | $2,400 | $4,725 |
| Gain from sale of 100-acre parcel (3) | - - - | 217,588 | 92,438 |
| Gain from sale of vehicle | - - - | 4,266 | - - - |
| Interest income | - - - | - - - | 39,000 |
| Total income | - - - | 244,254 | 136,163 |
| Rental expenses | - - - | - - - | - - - |
| Depreciation | $71,524 | 71,363 | 55,261 |
| Interest | 60,261 | 45,864 | 36,200 |
| Real estate taxes | 29,459 | 16,966 | 22,038 |
| Total expenses | 161,244 | 134,193 | 113,499 |
| Net income (loss) | (161,244) | 90,061 | 22,664 |
| Cash-flow from operations (4) | (90,120) | (60,430) | (14,513) |
| Advances made to corporation and club (5) | (27,260) | 88,866 | 32,806 |

| Corporation & club (6) | | (7) | |
|---|---|---|---|
| Sales | 250,427 | 266,128 | 420,259 |
| Cost of goods sold | 121,677 | 170,425 | 242,214 |
| Gross profits | 128,760 | 95,703 | 178,045 |
| Other revenues (dues, green fees, etc.) | 251,299 | 256,497 | 419,852 |
| Total income | 380,059 | 352,200 | 597,627 |
| Operating expenses | 372,130 | 386,623 | 561,667 (9) |
| Net income (loss) | 7,929 | (34,423) | 35,960 |
| Cash-flow from operations (4) | 29,252 | (46,725) | 74,120 |
| Cash expended for replacement of golf carts and golf cart batteries | 13,256 | 7,614 | 106,399 |
| Cash-flow after replacing carts and batteries | 15,996 | (54,339) | (32,279) |

## NOTES

(1) Data based on financial statements.

(2) From rental of the 5-acre parcel.

(3) Amount of gain recognized under the installment method of reporting. The parcel was sold for $900,000 and had a basis of $117,310. The payment received in 1978 was $250,000, and in 1979 was $106,250.

(4) Determined by adjusting net income for depreciation and changes in operating assets (e.g., accounts receivable, accounts payable and accrued expenses, prepaid expenses, and customer deposits).

(5) Figures without parentheses indicate a flow of cash from Medford Associates to the corporation and club, either in the form of advances to, or repayment of prior advances from, the latter. Figures in parentheses indicate cash-flows in the opposite direction in either form.

(6) The corporation and club were combined for purposes of financial reporting (although not for tax purposes), and intercompany transactions and balances were eliminated. Because the principals of these organizations believed that combined reporting best reflected economic reality, so do we. Data is taken from tax returns only in the absence of financial statements.

(7) From Federal income tax returns (Forms 1120), as no financial statement for this year is in the record.

(8) Information not in the record.

(9) The financial statements reflect an accrual of $60,000 rent to the partnership but state that, because of adverse cash-flow, the rent will not be paid. Also, the accrued rent is not reflected on the income tax returns. We have thus reduced the operating expense total, taken from the financial statements, by $60,000.